## 67726. GRIFFIN v. THE STATE.

DEEN, Presiding Judge.

At approximately 8:00 p.m. on June 27, 1979, Jerry Penney, having passed out at Eva's Tavern in Rome, Georgia, was arrested and placed in the police station drunk tank. At that time, Penney had no noticeable injuries. Around midnight, following his arrest for being drunk and disorderly, the appellant, Nathaniel Griffin, was placed in the same drunk tank. Penney was lying on the floor, still unconscious and unharmed.

Penney's position during the remainder of the night was somewhat in dispute. Steve Vasil was also placed in the drunk tank from approximately 1:30 a.m. until 2:15 a.m., and he recalled that Penney had gotten up and lain down on the concrete slab next to the appellant. The police officer who placed Vasil in the cell and later retrieved him, however, claimed that Penney's position on the floor had not changed. When one officer went to the drunk tank around 8:00 a.m., he found Penney sprawled out, with his pants removed, on the floor next to the shower stall; there were noticeable injuries to Penney's head, and there was blood on the cell floor and walls. The appellant was sitting on the concrete slab.

When questioned, the appellant explained that he did not know what had happened to Penney. When he was put into the drunk tank, he had gotten Penney off the floor and placed him on the cell's concrete slab along the wall which served as seating. The appellant then fell asleep until he subsequently was awakened when Vasil was placed in the cell. At that time, he noticed Penney on the floor and bleeding from the nose and mouth. He got Penney back onto the concrete seating, removed and wet his own undershirt, and wiped Penney's face. After Vasil was removed from the cell, the appellant had unrolled toilet paper onto the cool concrete and had gone to sleep. At trial, the appellant recounted essentially the same explanation.

Dr. Charles Sennett examined Penney at the hospital emergency room shortly afterwards, and observed multiple bruises and contusions about his head and face. A CT scan revealed a blood clot on the

brain. Other tests revealed a blood alcohol content of .162 percent and a barbiturate level of 0.9. (Dr. Sennett estimated that Penney's blood alcohol content at the time of his arrest probably approached .4 percent.) Neurosurgery was performed to remove the clot, but significant brain damage had already occurred and Penney remained comatose until his death on March 18, 1982 (resulting from a gunshot wound to the chest). During the autopsy, Dr. Sennett found that 75 percent of Penney's brain had been destroyed, and that that damage had occurred in excess of several months earlier. The physician explained that the brain injury resulted from internal movement of the brain, which could have been caused by violently shaking, or by falling and striking one's head, or by forceful blows to the head.

Dr. Harris Pittman performed the neurosurgery on Penney on June 28, 1979, and noted that Penney would never again have led a functional existence because of the extensive brain damage. Dr. Pittman felt that the trauma to Penney's head could have been inflicted by anything from a wall to a shoe or fist, but he thought that it would be stretching one's imagination to believe that the injuries could have resulted from falling off the drunk tank concrete seating. While he acknowledged the possibility that the head injuries could have resulted from falling in the shower stall and striking the head on the concrete ledge and on the floor, Dr. Pittman nevertheless favored the theory of a severe beating.

The appellant was released soon after the interrogation, and, other than a month-long sojourn in Chattanooga, Tennessee, he remained in the Rome area until February 1981, when he relocated to his brother's residence in Vacaville, California. On or about August 15, 1981, according to Officer Jan Makowski of the Vacaville police department, the appellant approached him in the station parking lot and indicated that he wanted to talk to him about having killed someone. At the time, the appellant held an unfinished bottle of beer, walked unsteadily, and had an odor of alcohol on his breath. Makowski informed the appellant of his Miranda rights, despite the appellant's protests that he already knew them. The appellant then divulged that while in jail in Rome, Georgia, he had knocked unconscious another cellmate in a fight, and that the victim had been in a coma ever since and very likely had died. Immediately following the interview, Makowski placed the appellant under arrest for public drunkenness and sent a teletype inquiry to the Rome police department regarding the appellant's story. The appellant was released from custody hours later, however, before a responsive teletype was received. A few days later, Rome police officers arrived and arrested the appellant. The appellant subsequently denied approaching Makowski and making the statement, and instead claimed that Makowski had driven past him, pulled over, and arrested him for public

drunkenness.

Following his trial and conviction for aggravated battery, the appellant was sentenced to 20 years' imprisonment. On appeal, he contends that the trial court erred with several evidentiary rulings; that the trial court erred in not declaring a mistrial because of improper questioning or comments made by the prosecutor; that the trial court erred in allowing the prosecutor to refer to the appellant's moving to California as flight from the jurisdiction and in instructing the jury on the law of flight; that the trial court erred in sentencing the appellant to the maximum sentence under the recidivist statute; and that the evidence was insufficient to support the verdict. *Held*:

1. The appellant contends that the trial court incorrectly allowed the jury to hear the testimony about the appellant's confession in California, because the court never made a finding that the confession had been voluntary. Review of the record does not substantiate that contention.

"[A] jury is not to hear a confession unless and until the trial judge has determined that it was freely and voluntarily given. The rule allows the jury, if it so chooses, to give absolutely no weight to the confession in determining the guilt or innocence of the defendant but it is not for the jury to make the primary determination of voluntariness. Although the judge need not make formal findings of fact or write an opinion, his conclusion that the confession is voluntary must appear from the record with unmistakable clarity." Sims v. Georgia, 385 U. S. 538, 543-544 (87 SC 639, 17 LE2d 593) (1967); *Payne v. State*, 249 Ga. 354, 359-360 (291 SE2d 226) (1982). In the instant case, following a Jackson-Denno hearing, the trial court specifically held that the appellant's constitutional safeguards had been observed and that there was sufficient evidence to find that the appellant had been aware of what he was doing. The clear and unmistakable meaning of that ruling was that the appellant had been advised of and understood his rights, and that he had voluntarily chosen to waive those rights. The trial court properly allowed the jury to consider the evidence of the appellant's confession.

2. The appellant also contends that the trial court erred in admitting several physical items removed from the drunk tank following the incident, including a pair of boots, tissue paper, a comb, a matchbook, a pair of blue jeans, a white undershirt, and a pair of black socks. However, despite the inability of the various police custodians to recount an uninterrupted chain of custody, the officer who collected the items from the drunk tank identified them as the same articles, or at least what appeared to be. "Unlike more fungible articles, the exhibits [in this case] could be identified upon mere observation; therefore, it was not necessary to trace their custody by requiring each custodian of the exhibits to testify." *Lord v. State*, 134 Ga.

App. 683, 684 (215 SE2d 493) (1975); accord, *Benson v. State*, 164 Ga. App. 19 (295 SE2d 579) (1982).

Moreover, there is nothing to substantiate the appellant's speculative fear that the articles might have been tampered with before reaching the crime lab. The appellant himself claimed to have wiped blood off Penney's face with his undershirt, and the crime lab was able only to determine generally that human blood was on the clothing, and could not specify which type. Under these circumstances, even were a strict chain of custody of these distinct, physical objects required, no harm resulted from the lack of it.

3. The appellant also contends that the trial court erred in admitting Detective Barnett's testimony about his inquiry with the other prisoners in the cell block concerning any knowledge they might have about the Penney incident, on the grounds that it constituted inadmissible hearsay, as well as that officer's testimony that there was blood on the appellant's clothing, on the grounds that it was inadmissible opinion evidence.

The court allowed Barnett to recount that when he had asked other prisoners whether they had seen or heard anything happen in the drunk tank, no one had responded. OCGA § 24-3-2 provides that "[w]hen, in a legal investigation, information, conversations, letters and replies, and similar evidence are facts to explain conduct and ascertain motives, they shall be admitted in evidence not as hearsay but as original evidence." This code section, however, permits the admission of such evidence only when "the conduct and motives of the actor are matters concerning which the truth must be found (i.e., are relevant to the issues on trial)." *Momon v. State*, 249 Ga. 865, 867 (294 SE2d 482) (1982); *Little v. State*, 165 Ga. App. 389, 391 (300 SE2d 540) (1983). In this case, the elicited testimony served to explain the conduct of the investigating officer, and this specific conduct was not relevant to the issue at trial. Notwithstanding the above, however, we find no harmful error in the admission of testimony that none of the other prisoners saw or heard any disturbance in the drunk tank that night. See *Johnson v. State*, 238 Ga. 59 (230 SE2d 869) (1976); *Momon v. State*, supra.

The appellant's contention that the detective's testimony about blood on the appellant's clothing was inadmissible opinion evidence is without merit. At trial, counsel for the appellant objected to the testimony not on that basis, but on the ground that the testimony should be excluded because some of the clothing was not produced during the trial. There was no real dispute that blood stains were on the appellant's clothing; the appellant acknowledged such in the taped interview which was played and admitted into evidence, without objection, prior to Barnett's testimony. It is by now axiomatic that admission of evidence over objection, even if error, is harmless when

evidence to the same effect has already been admitted without objection. *Jones v. Brawner,* 160 Ga. App. 314 (287 SE2d 255) (1981); *Classic Restorations v. Bean,* 155 Ga. App. 694 (272 SE2d 557) (1980).

4. Both Officer Makowski of the Vacaville police force and Officer Kines of the Rome police force were allowed to testify that when they approached the appellant's brother in California to execute the arrest warrant for the appellant, the brother refused to allow them to enter his house. The trial court sustained the objection to any testimony recounting the actual verbal refusal. The appellant contends that even the general explanation of why the two officers did not enter the house of the appellant's brother constituted inadmissible hearsay which was prejudicial in that it implied that the appellant was evading the police.

The state maintains that the evidence was admissible as explanation of the officer's conduct. As discussed above, however, the restrictive application of OCGA § 24-3-2 required by *Momon v. State,* supra, no longer provides such saving grace of admissibility in this case, because the officer's conduct was not at issue. Nevertheless, it cannot be said that reversible error resulted from the general testimony of Officer Kines that the appellant's brother refused to allow them entrance. Officer Makowski had earlier given identical testimony, without objection, and such rendered harmless the admission of the later testimony. Moreover, the trial court's ruling clearly indicated that the testimony was competent only for the purpose of explaining why the officers did not enter the house to execute the arrest warrant and that it had no bearing on the case against the appellant. Despite our conclusion that the testimony was not competent even for that limited purpose, it is highly improbable that any possible, prejudicial use of the testimony survived the trial court's ruling.

5. Dr. Pittman, who performed neurosurgery on Penney, was shown photographs of the drunk tank and allowed to testify that in his opinion the injuries were probably sustained in a severe beating, as opposed to falling in the cell. The appellant contends that this opinion was mere conjecture and therefore erroneously admitted into evidence.

OCGA § 24-9-67 provides that "[t]he opinions of experts on any question of science, skill, trade, or like questions shall always be admissible; and such opinions may be given on the facts as proved by other witnesses." If an expert witness is asked to draw an inference of fact from data observed by himself or presented by others, such an opinion is one of fact and proper opinion evidence, even though it purports to answer an ultimate question of fact in the case. *King v. Browning,* 246 Ga. 46 (268 SE2d 653) (1980); *Security Life Ins. Co. v. Blitch,* 155 Ga. App. 167 (270 SE2d 349) (1980). Accordingly, the trial

court properly allowed Dr. Pittman to express his opinion on the cause of the victim's injuries, considering the structural design of the place of injury and the nature of the injuries.

6. Following the appellant's presentation of evidence, including his own testimony, that at the time of the Penney incident in the drunk tank, he had certain physical injuries which limited his physical exertion, the trial court allowed the prosecutor to ask the appellant whether the physical injuries had limited his ability to fight with his brother just before his arrest for being drunk and disorderly; the prosecutor also was allowed to present rebuttal testimony of the arresting officers recounting the appellant's pre-arrest altercation with his brother. The appellant contends that this testimony impermissibly placed his character into evidence.

The appellant placed in issue his particular physical limitations at the time of his arrest on June 27, 1979. The prosecutor's cross-examination of the appellant and the presentation of the rebuttal testimony were proper subjects of inquiry and admissible for the purpose of contradicting the appellant's allegations of physical limitations. The trial court clearly instructed the jury that the testimony was limited to that purpose. Because the evidence may have incidentally placed the appellant's character in issue, it did not become inadmissible. *Fryer v. State*, 165 Ga. App. 157 (299 SE2d 884) (1983); accord, *Smith v. State*, 165 Ga. App. 669 (302 SE2d 414) (1983).

7. The appellant contends that the trial court should have declared a mistrial because of the prosecutor's reference, during closing argument, to the appellant as an alcoholic, and because of the prosecutor's comment during closing argument that the appellant had fled the jurisdiction to avoid the trial in the federal civil suit brought by Penney's survivors against the City of Rome (seeking damages for the injuries sustained in the drunk tank). In closing argument, however, the prosecutor may argue all reasonable inferences and deductions which might have been drawn from the evidence, however illogical the inferences or deductions may seem to the defendant. *Wisdom v. State*, 234 Ga. 650 (217 SE2d 244) (1975); *Garrett v. State*, 160 Ga. App. 877 (288 SE2d 592) (1982); *Sharp v. State*, 153 Ga. App. 486 (265 SE2d 837) (1980). In this case, the appellant was drunk when he was arrested in Rome, Georgia, on June 27, 1979, and in Vacaville, California, on August 15, 1981; further, he admitted to having sought treatment for alcohol abuse at detoxification centers and the VA hospital. The evidence authorized the inference or deduction that the appellant was an alcoholic.

For the same reason, we do not find objectionable the prosecutor's suggestion during closing argument that the appellant fled the jurisdiction to California to avoid having to testify in the federal civil suit brought by Penney's survivors against the City of Rome. The ap-

pellant was arrested in California, and upon cross-examination of the appellant, he was questioned with regard to his reason for moving to California. He, of course, denied that he fled the state to avoid appearing as a witness in the Penney federal civil suit, but he admitted that he had been aware of that civil action and, in fact, was properly cross-examined about prior inconsistent statements he made about the incident in a deposition given to one of the parties of that litigation. Under these circumstances, we conclude that the prosecutor's comment was a permissible inference drawn from the evidence.

8. The appellant also contends that the trial court erred in instructing the jury on the law of flight. The trial court was careful to instruct the jury that it must determine whether a flight occurred and whether or not the flight was due to a sense of guilt or for other reasons, which was a correct statement of the law of flight. *Lewis v. State*, 200 Ga. 388 (37 SE2d 405) (1946); *Young v. State*, 239 Ga. 53 (236 SE2d 1) (1977); see also, *Fountain v. State*, 149 Ga. 519 (7) (101 SE 294) (1919). While an immediate flight is not necessary to authorize a jury charge on the matter, as "there can be no set or specific time necessary to constitute flight. . .," *Hamby v. State*, 71 Ga. App. 817, 819 (32 SE2d 546) (1944); *Johnson v. State*, 148 Ga. App. 702 (252 SE2d 205) (1979), the evidence of the appellant's removal to California approximately 20 months after the Penney incident, without more, probably would not have authorized a jury charge on flight because of the remoteness in time; there was, however, other evidence of flight, in that the appellant admitted to having moved to Chattanooga, Tennessee, shortly after the incident. Even though this relocation lasted but one month, after which he returned to the Rome area until he moved to California, it was sufficient evidence to authorize a jury charge on flight.

9. The appellant next contends that he was improperly sentenced as a recidivist. We agree that he could not properly have been sentenced as a recidivist under OCGA § 17-10-7, on the basis of but one prior, out-of-state felony conviction. See *Cofer v. State*, 166 Ga. App. 436 (304 SE2d 537) (1983). However, it appears from the record that the trial court merely considered the previous out-of-state manslaughter conviction as an aggravating circumstance in determining the appropriate sentence and did not sentence the appellant as a recidivist.

10. Viewing the evidence in the light most favorable to uphold the jury's verdict, there was sufficient competent evidence for a rational trier of fact to find the appellant guilty of aggravated battery beyond a reasonable doubt. Jackson v. Virginia, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

*Judgment affirmed. McMurray, C. J., and Sognier, J., concur.*

DECIDED FEBRUARY 29, 1984 —
REHEARING DENIED MARCH 14, 1984 —

*Ronald G. Shedd*, for appellant.
*F. Larry Salmon, District Attorney, William H. Boggs, Assistant District Attorney*, for appellee.