68982. KORNEGAY et al. v. THE STATE.
(329 SE2d 601)

BEASLEY, Judge.

Defendants Kornegay and Tennyson were charged with rape, aggravated assault, and two counts of kidnapping with bodily injury. They were convicted of rape, and defendant Tennyson was convicted also of simple battery. Tennyson was sentenced to a total of fifteen years and Kornegay to twelve years. They were represented by retained counsel at trial.

Following conviction and sentencing, counsel filed a motion on the general grounds. Before the hearing on the motion, new counsel filed a motion for new trial which repeated the general grounds and added two more. The two additional grounds were ineffective assistance and representation of counsel and inflammatory remarks by their counsel which were allegedly prejudicial to the defendants. Although there was no formal withdrawal, apparently the substitution

of attorneys was tacitly agreed to by everyone. After a hearing, the court denied the motion. The new counsel now represents defendants on appeal from the judgments of conviction and sentence.

Appellants enumerate as error their attorney's closing argument, on the ground that it was such that it denied them their right to effective assistance of counsel as guaranteed by the Sixth Amendment to the United States Constitution. No objection was made to the argument at trial, nor did the court intervene to affect it in any way.

Defendants' theory of the case was that the young couple hitchhiking from Wisconsin not only consented to the sexual intercourse with the woman but actually offered it in partial payment for a ride to Columbus, their destination. Defendants both testified to this effect.

Counsel's closing argument to the jury was based on the tack that the behavior of all four parties involved was despicable, but that what defendants had done was not rape and that despite what "sorry" individuals defendants were, the state had not proved beyond a reasonable doubt that the intercourse was without the consent of Ms. Daniels. It was further argued that defendants had authored no threats or injury to Ms. Daniels' companion and that no kidnapping ever occurred.

Counsel appealed to the jurors, not asking them to find that defendants were blameless individuals for the episode engaged in, but that they certainly were not guilty of crimes. He of course blasted the character of the hitchhikers and asked that the verdict demonstrate that such people were not welcome in the community. But he said of defendants: "I told them [when I went to see them before trial], 'Y'all are the sorriest bastards I have ever seen,' telling these [referring to defendants]. I said, 'Y'all niggers 40 or 50 years ago would be lynched for something like this, but you're not under the law guilty of rape because these people are just as guilty as you are.'" He reinforced this with further demeaning references and stories regarding race, and at the end of his argument he summed it all up by saying, "It just ain't right for them [the hitchhikers] to come through here doing what they did and it was not right for the two niggers to do what they did."

On appeal, defendants complain that their attorney did not meet the standards for effective assistance of counsel guaranteed by the Sixth Amendment in that he went so overboard in trying to make it palatable for the jury to acquit them without having it appear that the jury was approving of defendants' character and behavior, that he actually took up sides with the state and abandoned the defense of his clients, and in calling them "the sorriest bastards he had ever seen," and "niggers." *Held*:

Because of the presumption that a lawyer is competent, "the bur-

den rests on the accused to demonstrate a constitutional violation." *United States v. Cronic*, 52 LW 4560, 4562-3 (1984). The standard by which to measure claims of "actual ineffectiveness," as was claimed by defendants, is set out in *Strickland v. Washington*, 52 LW 4565 (1984): "The benchmark for judging any claim of ineffectiveness," the Court wrote, "must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Id. at 4570. The question divides itself into two parts: "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id. at 4570. See *Davenport v. State*, 172 Ga. App. 848 (324 SE2d 201) (1984).

Prevailing standards for counsel are succinctly stated in the ABA Standards for Criminal Justice, which includes The Defense Function. It commands that "[a] lawyer should not make arguments calculated to inflame the passions or prejudices of the jury." General Standard 7.8 (c), "The Defense Function" (Approved Draft). Remarks of counsel evoking racial, religious, or ethnic prejudice should never be made in a court of justice. ABA Standards, "The Defense Function" (Commentary) 305.

Counsel has wide latitude in closing argument, in choice of theory to be advanced, in choice of style, tactics, language. The court will not second-guess the attorney who has undertaken the responsibility for representing his clients in their fight against the charges brought. As the Supreme Court has said: "In closing arguments each side is permitted to make any argument which is reasonably suggested by the evidence." *Durden v. State*, 250 Ga. 325, 329-330 (297 SE2d 237) (1982). The parameters were long ago explained in *Walker v. State*, 5 Ga. App. 367 (63 SE 142) (1908): "Counsel should not go outside the facts appearing in the case and the inferences to be deduced therefrom, and lug in extraneous matters as if they were a part of the case; but upon the facts in the record, and upon the deductions he may choose to draw therefrom, an attorney may make almost any form of argument he desires. Of course, there are certain exceptions dictated by the decorum of the court and similar considerations; but the remarks here objected to are within no such exception. We are not inclined to countenance any undue hampering the right of counsel to argue cases in whatever manner may seem to them most expedient." This was further explained: "All reasonable latitude should be allowed attorneys in their arguments to the jury on the facts and on

inferences and deductions from the facts." *Martin v. State*, 5 Ga. App. 606 (63 SE 605) (1909). Such is good law today. See *Walker v. State*, 232 Ga. 33, 36-37 (205 SE2d 260) (1974); *Dickens v. Adams*, 137 Ga. App. 564, 569 (224 SE2d 468) (1976).

The closing argument must be read in its entirety to ascertain whether counsel failed to meet the constitutional standards. While we do not approve the offensive and crude language which was used throughout, we do not find that it showed or intimated in any way that counsel had joined the state in asking for conviction or that he had abandoned the defendants' cause. Quite the contrary.

But the closing argument goes beyond the bounds of permissibility in that it opens a door for the factor of race to be considered by the jury in determining guilt or innocence of the defendants. The record does not indicate that defendants acquiesced in it in any way. Can the law presume that these defendants acquiesced in or even knew their attorney would employ this unlawful tactic, just because they did not jump up and object when he ignored the law's prohibition and called them "niggers" in his closing argument, the finale of the case?

Counsel's repeated use of the racial epithet should have been stopped with a strong reprimand by the trial court, at the very least, even if counsel meant this line of argument as a trial tactic on defendants' behalf. See OCGA § 17-8-75. As stated in *Seaboard Coast Line R. v. Towns*, 156 Ga. App. 24 (274 SE2d 74) (1980): "The appellate courts of this state have long held that an argument reasonably calculated to appeal to or evoke racial prejudice is improper and that a trial court, in denying a motion for mistrial, must take 'some action to prevent unfair prejudice to a party by admonition or rebuke to counsel and/or instruction to the jury with the purpose of eradicating the effect of prejudicial remarks.' *Brown v. State*, 110 Ga. App. 401, 406 (138 SE2d 741) (1964)." The court did not reprimand counsel or instruct the jury, thus by its silence giving the imprimatur of judicial tolerance to the factor of race being at least subliminally relevant to consideration of guilt or innocence. Appeals to the prejudice engendered by belief in racial inferiority have no place in our system of criminal justice, see *Ham v. South Carolina*, 409 U. S. 524 (93 SC 848, 35 LE2d 46) (1973), even if the theory is that the prejudice would work in defendants' favor.

The factor of racial prejudice has been formally and officially squelched in our society after long and arduous struggles. Where it remains informally, it cannot be condoned. Certainly, then, its use cannot be invoked by counsel in a court of law, without running counter to the Sixth and Fourteenth Amendments' guarantees.

Racial prejudice being a highly volatile and incipient and cancerous factor, its deliberate introduction rendered counsel's performance

deficient. See *Hamilton v. Alabama*, 376 U. S. 650 (84 SC 982, 11 LE2d 979) (1963), facts set out in *Bell v. Maryland*, 378 U. S. 226, 248, fn. 4 (84 SC 1814, 12 LE2d 822) (1964), reversing contempt against a black witness who refused to answer due to the solicitor's insistence on calling her by her first name. The Court denominated it a "relic of slavery."

The second inquiry is whether the deficient performance prejudiced the defense. Protections against racial prejudice derive constitutional stature from a principal purpose as well as from the language of those who adopted the Fourteenth Amendment. *Ham v. South Carolina*, supra, 409 U. S. at 526-528. When there is error, the test is whether it is highly probable that the error did not contribute to the judgment, so as to render [it] harmless beyond a reasonable doubt." *Dixon v. State*, 173 Ga. App. 280 (325 SE2d 893) (1985). *Sanford v. State*, 153 Ga. App. 541, 542 (265 SE2d 868) (1980). In applying this test, we must keep in mind that "one of the purposes of the Due Process Clause of the Fourteenth Amendment is to insure [the] 'essential demands of fairness.' " *Ham*, supra, 409 U. S. at 526. How can we conclude it was harmless error, applying the test? Just because defendants were found not guilty of kidnapping the couple who asked for a ride, and of aggravated assault on the male, does not demonstrate clearly that, when it came to a consideration of the racially emotional charge of rape by "niggers" of a young white woman, the inferentially sanctioned connotation of lesser status and easier conviction did not infect and affect the jurors' minds. We cannot presume the absence of unlawful discrimination; the presumption instead, in the circumstances of this case, is that the injection of prejudice infected the verdict. At the least, it was offered as an ingredient for consideration, without any hint of prohibition by the court, and we cannot say the jury excised or rejected it. We cannot say that counsel's unlawful characterizations did not allow the jury to regard defendants as racially inferior persons whose conviction for that reason would therefore be more easily reached. See *Brown v. State*, 110 Ga. App. 401, 405 (138 SE2d 741) (1964). The "essential demands of fairness" insured by the Due Process Clause of the Fourteenth Amendment require a new trial.

*Judgment reversed. Deen, P. J., Pope and Benham, JJ., concur. Deen, P. J., and Benham, J., concur specially. McMurray, P. J., concurs in the judgment only. Banke, C. J., Birdsong, P. J., Carley and Sognier, JJ., dissent.*

DEEN, Presiding Judge, concurring specially.

The majority opinion and dissent directly focus on the key issue in this case of whether, in view of the offensive language used by the defendant's own lawyer, the jury was allowed to regard defendants as

"racially inferior persons," infecting the jury verdict and causing harmful error.

During the closing argument, the prosecutor and defendants' counsel have wide latitude in drawing conclusions and deductions from the evidence, however illogical, unreasonable, or absurd. *Griffin v. State*, 170 Ga. App. 287, 292 (316 SE2d 797) (1984). Even characterizations equating parties to the case as a brute, beast, an animal, and a mad dog have been held not to be error. *Miller v. State*, 226 Ga. 730 (5) (177 SE2d 253) (1970); *Shelton v. State*, 146 Ga. App. 763, 766 (247 SE2d 580) (1978). There is a distinction with a difference, however, in categorizing defendants as "animals" on the one hand and in resorting to slurs such as "nigger," "sons-of-bitches," and "bastards" (and declaring that they would have been fit for lynching had the same conduct been exhibited 40 or 50 years ago) on the other. The former flight of oratory, while extravagant, is nevertheless allegorical, poetical, and mythical, while the latter are literal, personal slurs and attacks on a human being, and definite character assassination. Crude and personal slurs against one's race, creed, sex, religion, ancestry or national origin should have no place in twentieth century jurisprudence.

The dissent relies chiefly on *Hoxie v. State*, 114 Ga. 19 (3) (39 SE 944) (1901), wherein the prosecutor during closing argument uttered that "[n]egroes, as a rule, are of low moral status; they care nothing about the marriage relation; they just take up with each other and stay until they get tired or find some other one they like better, and go off and take up with another, and never think about marrying." Several observations are offered about *Hoxie*: (1) while *Hoxie* was written at the turn of the century at a time when racial slurs were perhaps more common, and, unfortunately, not necessarily thought of by some as grossly improper, the court there still concluded that the prosecutor's racially derogatory remark was highly improper; (2) the Supreme Court in *Hoxie*, forthrightly and without equivocation as should be done in most cases, did not shy away from identifying and setting out in detail the objectionable comment so that there could be no question about its condemnation (and this court must do no less here despite anyone's embarrassment or indignation. If this court is ever in doubt as to inclusion or exclusion of salient, applicable facts, then we must always lean toward the former rather than the latter); (3) the prosecutor's comment in *Hoxie* was obnoxious not for use of any racially inflammatory words, but its superior and supremist racial implications and attitude alone; (4) whereas in *Hoxie* the improper comment was made by the prosecutor (and objected to by the defendants' attorney), in this case the *defendants' own lawyer* uttered the previously mentioned derogatory remarks. In short, the improper language used in this case obviously were far more inflammatory, and

equally derogatory (or more), than those in *Hoxie,* and there was no one in the courtroom here to object to such on behalf of the defendants.

The attitude (and language) practiced by the defendants' lawyer in this case has demonstrated itself to be a time-dishonored one. Even the courts during the nineteenth century were occasionally guilty of similar indiscretion. See *Choice v. State,* 31 Ga. 424, 473 (1860) ("Ethiopian to change his skin"); reference is also made to the memorial honoring deceased judges contained in 83 Ga. 807, 814 (1889). Compare some of the language in the anecdotes about the parties, lawyers, and judges in some actual Georgia trial cases recounted by one of the first judges of this court, Arthur Gray Powell, in his book, *I Can Go Home Again* (originally published in 1943). Probably the most popular single publication during the nineteenth century was "On the Origin of Species by Means of Natural Selection *or the Preservation of Favoured Races in the Struggle for Life*" (emphasis supplied), which is still held in high esteem by many today. The underlined subtitle provided inferences for many that class structure was fixed by the laws of nature in a type of racial survival of the fittest, but this connotation is now de-emphasized even by those who accept and are believers of the major concept advanced in this much read publication.

The majority opinion relies upon twentieth century ABA standards for criminal justice, which are calculated to deter inflaming the passions and prejudices of the jury. This court should adopt the majority opinion and guidelines set up therein, and reject the ancient and outmoded views of a bygone era. The grossly improper language of racial slurs made during the trial, even though without objection, cannot be sanctioned in this case. It should be emphasized that reversal in this case is demanded by the totality of the circumstances. It may be that a solitary remark of the nature here condemned, or such a remark, in a different setting, followed by proper objection and curative instruction, would not require reversal. Resolution necessarily should involve a case-by-case analysis considering all the circumstances.

The idea of preservation of favored races, or implications of superior or inferior races should be rejected by this court as impermissible in a court trial. There is only one race — the human race — and this places all on notice that no one is above or below the law which provides equal protection for all, regardless of sex, race, creed, religion, ancestry or national origin.

I am authorized to state that Judge Benham joins in this special concurrence.

BENHAM, Judge, concurring specially.

I concur in the letter and the spirit of the majority opinion by Judge Beasley and the special concurrence of Presiding Judge Deen, and I specially concur to illuminate the reasoning which undergirds the majority opinion and to distinguish the ruling in *Hoxie v. State*, 114 Ga. 19 (3) (39 SE 944) (1901), upon which the dissent relies.

The issues of inflammatory remarks and ineffective assistance of counsel are so closely interwoven in the case before us that they can be discussed as one, and in view of the excellent treatment of the facts by the majority opinion, a rehashing of them would be tautological except as they bear on matters addressed in this special concurrence.

This case contains some horrendously reprehensible racial epithets, and while this court frowns on the use of words of such a provocative and insulting nature, no genteel reference can be made to them in this opinion without destroying the impact of the case. Therefore, we mention these words only to underscore their reprehensibility.

During the trial, the word "nigger" was used six times, the word "sons-of-bitches" twice, and the word "bastards" once. These words take on special meaning and significance when viewed in light of the prosecution's presentation of the case, which concerned a charge of interracial rape wherein, during the course of the offenses, it is alleged that the two black defendants said that they hated white people.

The dissent, in relying on *Hoxie v. State*, supra, and *Sanford v. State*, 153 Ga. App. 541, 542 (265 SE2d 868) (1980), contends that while racial slurs are disfavored, it was "highly probable" that the language did not contribute to the verdict of guilty and that a new trial would be unwarranted. The dissent fails to correctly apply the explicit language of *Hoxie v. State*, at Hn. 3: "The use of unfair or improper language by an attorney in arguing a case will not be held cause for a new trial when it is certain that no injury could possibly have resulted therefrom to the losing party." It cannot be said with certainty that this language did not injure the defendants.

It defies reason to say that repeated racial slurs of such reprehensible magnitude in an interracial rape trial of this nature do not impact adversely on the jury. The United States Supreme Court, as early as *Battle v. United States*, 209 U. S. 36 (28 SC 422, 52 LE 670) (1908), condemned appeals to racial prejudice; and as recently as *Brown v. State*, 110 Ga. App. 401, 406 (138 SE2d 741) (1964), this court, in commenting on the right to a fair trial, stated: " 'The Constitution guarantees to every defendant a fair and impartial trial. Every litigant is entitled to the same right, and he does not get it where any influence except the law and the evidence is allowed to affect the minds of the jury.' " Language such as we have here constitutes a can-

cerous growth on the legal process, and it must be exposed and excised before it metastasizes and destroys the viability of American jurisprudence.

While we as a body might disagree as to the effect of the language in this case, the abhorrence of such racial slurs is unanimously condemned which is clearly evident by the language of the dissent which states that "[we] as much as the majority find the language to be morally as well as legally reprehensible."

Our repulsion here is anchored not only in precedent, but also in universal principles of common decency and fair play. The appellate courts of this State in fulfilling their obligation to provide guidance and direction to the bench and bar must look beyond the isolated incidents and *focus* on the need for creating an atmosphere conducive to a fair trial.

While I do not say that in every instance where racial slurs are introduced, the trial court must interpose an objection if none is made and admonish the offending party; I do say that when such comments have the potential for infecting the trial process, such a step must be taken. It makes no difference whether racial slurs are used as a prosecutorial ploy or a defense tactic; the venom is no less potent in poisoning the legal process, and such tactics must be openly and forthrightly condemned.

For the reasons mentioned above, in addition to those expressed in the majority opinion, I concur.

I am authorized to state that Presiding Judge Deen joins in this special concurrence.

BANKE, Chief Judge, dissenting.

While I join fully in Judge Carley's dissent, I believe a few points should be emphasized. There is no division on this Court in finding the language used by defense counsel to be odious and obnoxious. However, I do not believe we are entitled to substitute our judgment for that of defense counsel on a question of trial strategy in a case where that strategy was obviously effective to a large extent, in that the defendants were acquitted of three of the four felony offenses with which they were charged.

It is one thing to accept the defendants' contention that their counsel went "overboard in trying to make it palatable for the jury to acquit them without having it appear that the jury was approving of defendants' character and behavior . . . " It is quite another thing to reverse the defendants' convictions on this ground. Although we may agree that the trial court had the right to step in and rebuke counsel in order to protect the dignity of the proceedings, I do not believe the court's failure to do so inures to the benefit of the defendants under the circumstances of this case. I fear that the effect of the majority's

opinion is to permit defense counsel to build reversible error into the record through the expedient of going "overboard" in pursuing a favorable verdict.

I would affirm the convictions.

I am authorized to state that Presiding Judge Birdsong and Judge Carley join in this dissent.

CARLEY, Judge, dissenting.

In my opinion, the majority, in its haste to express the disapproval that is warranted by the admittedly offensive and crude language employed by counsel, loses sight of one fact. The mere uncorrected use of offensive and crude language in the context of closing argument is not ipso facto a ground which always warrants the reversal of a criminal conviction. "The use of unfair or improper language by an attorney in arguing a case will not be held cause for a new trial when it is certain that no injury could possibly have resulted therefrom to the losing party." *Hoxie v. State,* 114 Ga. 19 (3) (39 SE 944) (1901) (holding that closing argument containing racial slurs constituted "grossly improper conduct" and a "reprehensible and wholly inexcusable practice" but was harmless under the circumstances). It is indeed the law of this State that the trial court "must take 'some action to prevent unfair prejudice to a party by admonition or rebuke to counsel and/or instruction to the jury with the purpose of eradicating the effect of prejudicial remarks.' [Cit.]" *Seaboard Coast Line R. v. Towns,* 156 Ga. App. 24 (274 SE2d 74) (1980). It is also the law of this State that a trial court has no "independent duty to interpose and prevent prejudicial statements. . . ." *Williams v. State,* 251 Ga. 749, 801 (312 SE2d 40) (1983). However, I will assume for the sake of argument that since it was appellants' own counsel who employed the grossly improper language, the trial court erred in failing to reprimand counsel on its own motion. Nonetheless, "[w]hat we must decide is whether the uncorrected argument of counsel in this case resulted in a miscarriage of justice. [Cit.] The proper standard for such a determination is the ' "highly probable test," i.e., that it is highly probable that the error did not contribute to the judgment.' [Cit.]" *Sanford v. State,* 153 Ga. App. 541, 542 (265 SE2d 868) (1980).

The majority opines that the offensive language in the instant case was prejudicial to appellants insofar as it "allow[ed] the jury to regard [them] as racially inferior persons whose conviction for that reason would therefore be more easily reached." (Majority opinion, page 283.) There is no doubt that the language could have that effect and I, as much as the majority, find that language to be morally as well as legally reprehensible. However, appellants were *acquitted* of aggravated assault and kidnapping with bodily injury by the same jury that supposedly was so prejudicially inflamed by counsel's argu-

ment that it considered race as the dispositive factor in reaching its verdict. Counsel did not expressly urge the jury to consider race in reaching its verdict. Insofar as counsel's argument could be construed as implicitly fostering that result, appellants' acquittals of crimes for which they might have been convicted had the jury been vindictively disposed to act solely out of racial motivations, leads me to conclude that it is "highly probable" that the prejudice that the majority finds in appellants' own counsel's closing argument is, in fact, non-existent and certainly did not contribute to the jury's verdict. If appellants had been convicted of all the crimes for which they were being tried, I would find more merit in the majority's conclusion that their convictions were infected by their counsel's gross and unjustified language employed in their defense and would concur in the reversal of those convictions.

Moreover, the majority would set an untenable precedent in the instant case. It recognizes, on the one hand, that "[c]ounsel has wide latitude in closing argument, in choice of theory to be advocated, in choice of style, tactics, language." It also recognizes that a "court will not second-guess the attorney who had undertaken the responsibility for representing his clients in their fight against the charges brought." Yet, the majority would, in fact, be sanctioning just such second-guessing by its reversal of appellants' convictions. The effect of the majority opinion is to authorize a client to acquiesce in his counsel's decision as to a matter of trial tactics and then, if not totally satisfied with the result of those trial tactics, to secure a reversal by urging in the appellate court that his own counsel's trial tactics were prejudicial to him.

In this case, appellants were acquitted of some crimes and as the majority correctly finds, the argument of appellants' counsel does not show or intimate in any way that he had joined the State "in asking for conviction or that he had abandoned the defendants' cause. *Quite the contrary*." (Emphasis supplied.) (Majority opinion, page 282.) This being true, I do not believe that we are authorized to reverse the instant convictions by second-guessing the effectiveness of the trial tactics of counsel who has secured, if not a total acquittal for his clients, at least a partial one. Although we should in no way condone or encourage those tactics, we should not reverse unless those tactics prejudiced the clients.

As was true in *Hoxie*, I find counsel's *language* to be "grossly improper" in the extreme. However, as was also true in *Hoxie*, I find no prejudice to appellants and therefore no reversible error based upon counsel's uncorrected use of that language in argument. This is a court for the correction of errors of law, not for the correction of mere "grossly improper" language employed by counsel or for second-guessing trial counsel as to the most effective presentation of his cli-

ents' case to the jury. I dissent not from the majority's indictment of counsel's language but only from the legal result that the majority finds that language to compel in the instant case. Most importantly, I fear the *effect* of the majority's holding on the future application of the principles of judicial review.

I am authorized to state that Chief Judge Banke, Presiding Judge Birdsong and Judge Sognier join in this dissent.

DECIDED MARCH 15, 1985 —
REHEARING DENIED MARCH 29, 1985 — ▮▮▮▮▮▮▮▮▮

*Alvin C. McDougald*, for appellants.
*Willis B. Sparks III, District Attorney, Wayne G. Tillis, Thomas J. Matthews, Assistant District Attorneys*, for appellee.