693 So.2d 393 (1996)
James BRELAND
v.
Gene Kelvin FORD.
1931653.
Supreme Court of Alabama.
May 3, 1996.
Opinion Overruling Rehearing Application February 7, 1997.
*394 Jack M. Curtis, Department of Public Safety Legal Unit, Montgomery, for appellant.
Ronald O. Gaiser, Jr. of Gaiser and Associates, Birmingham, J.L. Chestnut, Jr. of Chestnut, Sanders, Sanders, & Pettaway, P.C., Selma, Robert H. Turner, Marion, for appellee.
COOK, Justice.
James Breland, an Alabama State Trooper, appeals from a judgment entered on a jury verdict awarding $2,000,000 in compensatory damages to Gene Kelvin Ford in Ford's action against Breland seeking compensation for personal injuries Ford suffered during an arrest. We affirm.
Many of the facts pertinent to this case are in dispute. At the trial, however, testimony was offered during the presentation of Ford's case-in-chief suggesting that the following events occurred: On March 18, 1990, while 23-year-old Ford, a black male, was driving home from a neighborhood basketball park, he met Breland, a white male, who was on patrol in his automobile a short distance from Ford's home. When Breland's speed detection device indicated that Ford was exceeding the speed limit, he reversed directions and began following Ford. Ford saw Breland reverse directions, but did not realize that he was being pursued. Consequently, he proceeded homeward, turned into his driveway, and parked his car.
When Ford got out of his car, Breland struck him on the side of the head with his semi-automatic pistol. Ford ran into his house and retreated into one of the back rooms. Breland kicked in the door of the house and entered in pursuit, with a semiautomatic pistol in his hand.
Once inside, Breland shot Ford in the back as Ford was bending over to pick up one of his children. The force of the bullet, which passed through his body and exited from his stomach, caused Ford to fall to the floor. When Breland threatened to kill him if he moved and punctuated his threat with a racial slur, Ford arose from the floor and grappled with Breland for the pistol. Ford managed to get both hands on the pistol and grip it tightly. As Ford held the pistol in this manner, Breland fired a second time, narrowly missing Ford.[1]
Howard Brooks, one of Ford's neighbors, then entered the room. At trial, Brooks testified as follows:
"Question. [By Ford's counsel] Where was [Ford] when you saw him?
"Answer. [Brooks] Bending down holding Breland's hands ...the gunbegging him.
"....
"Question. And what did you see?
"Answer. I [saw] Breland [with] his hands on the gun, both hands on the gun, and [Ford] bent across a little ... sofa like that, saying: `Man, why did you shoot me?... I didn't do nothing.' I walked on in.
"....
"Answer. I said: `Y'all get these kids out [of] this house.' [Then] I walked up to [them and] I said: `Both y'all turn this gun loose.'
"[Ford] said: `I ain't taking no arrest, this man's trying to kill me.... Howard, this man ... shot me.'
"I didn't believe him at that particular time.... I said: `Breland, you ain't shot him?'
"[Breland] said: `No.'

*395 "[Ford] said: `Howard, this man ... shot me.' He said: `Breland, why did you shoot me? ... Please don't kill me.'
"I said: `[Ford], you can't go up against the law.'
"He said: `Howard, don't let this man take me nowhere. This man's trying to kill me.'
"By that time he was getting weaker and weaker, still begging, and ... [saying]: `Don't kill me.'
"About that time [I took the gun]. It [was] a semi-automatic and I didn't know how to kick the safety on. And I laid it on a tall gas heater. [Breland] reached and got his handcuffs. [Ford was] still begging: `Howard, don't let him take me.' He said: `I want some water.'
"I said: `Can I give him some water?'
"[Breland] said: `Don't give him nothing.'
"[Ford] said: `Howard, pull my shirt up.'
"His guts were running [out] from the front.
"....
"When I discoveredhe kept telling me he was shot but I didn't see it until he told me [to] pull his shirt up. [I was just] about to go out. [T]hen, when he said to pull his shirt up, I said: `Breland, you done shot this boy.'"
Ford lost consciousness and was taken by paramedics to the Selma Medical Center. His wound ultimately resulted in the loss of one kidney and damage to his colon.
On July 6, 1990, Ford filed a complaint in the Perry County Circuit Court against six defendants, including Breland; the Alabama Department of Public Safety; Captain George Jones, district superintendent; Thomas Wells, director of the Department of Public Safety; Sergeant R.E. Calvin, Perry County supervisor; and Captain Thomas McGee, chief of the Alabama State Trooper Training Academy. Ford alleged deprivations of rights guaranteed by the Constitution of the United States, for which he sought redress pursuant to 42 U.S.C. § 1983. His complaint also contained state law claims, including negligence, wantonness, and assault and battery. He sought $1,000,000 in compensation for the loss of his kidney, "permanent nerve and tissue damage," pain and suffering, deprivation of liberty, and medical and legal expenses. Eventually, the cause was submitted to a jury on theories of negligence and wantonness.
After the jury awarded Ford $2,000,000 in compensatory damages, Breland moved for a JNOV, or, in the alternative, a new trial, on the grounds (1) that he "enjoy[ed] substantive immunity under state law and is entitled to a verdict ... as a matter of law"; (2) that the verdict was against the weight of the evidence; (3) that the damages awarded were excessive; and that (4) that "[c]ertain argument of counsel for the plaintiff was so grossly improper and ... prejudicial as to require a new trial." Breland's motion was overruled. He appealed, asserting these same grounds. In addition, he contends that Ford exercised his peremptory strikes to remove white veniremembers in a manner that violated constitutional principles of equal protection. We shall address these contentions in that order.

I. Substantive Immunity
Breland contends that "he was engaged in the exercise of a discretionary function at the time [of] the incident [that] is the basis of this action," and, consequently, that "he enjoys ... good faith ... or substantive immunity" from suit. Brief of Appellant, at 12. Ford argues that Breland failed to preserve this issue for appellate review. More specifically, Ford insists, Breland failed to move for a directed verdict on the basis of immunity at any point in the trial. We agree with Ford's contention.
At the close of the plaintiff's case, the following colloquy occurred:
"DEFENSE COUNSEL NO. I: ... I would move for a directed verdict on the part of Tom Wells, Thomas McGee, George Jones, and Roy Calvin on the basis that... the plaintiff has put [nothing] into evidence that there was any lack of supervision or training on their parts with regard to Trooper Breland.... In addition, the defendants, under state law, enjoyed a *396 substantive immunity from suit for discretionary functions.

"....
"DEFENSE COUNSEL NO. II: Likewise, your Honor, we would file the same motion for directed verdict on behalf of Mr. Breland simply on the grounds that plaintiff has failed to prove [his] cause of action.

"....
"THE COURT: Okay. Your motion is granted except as to the defendant Breland."
(Emphasis added.) At the close of all the evidence, the defense moved, again, for a directed verdict, stating:
"Your Honor, ... we would like to make our motion for directed verdict on behalf of Trooper Breland. And the basis of our motion would be that under the evidence presented in this case ..., that a directed verdict should be entered in [Breland's] favor."

(Emphasis added.) The trial court denied this motion also.
These emphasized excerpts clearly demonstrate that the only ground ever assigned for Breland's directed verdict motions was that Ford had failed to present substantial evidence, as required by Ala.Code 1975, § 12-21-12, of any misfeasance. In other words, the basis for Breland's motion "simply ... that [the] plaintiff has failed to prove [his] cause of action" (emphasis added)stands in stark contrast to the bases for the co-defendants' motions.
"`[A] general motion for a directed verdict... can only go to the case in its entirety, and not to individual subdivisions; and, to preserve individual issues, a motion must be made for a [verdict-directing] instruction on each of the individual issues.'" Cone Builders, Inc. v. Kulesus, 585 So.2d 1284, 1290 (Ala.1991) (quoting Housing Authority of the City of Prichard v. Malloy, 341 So.2d 708, 709 (Ala.1977)) (emphasis added). Because Breland's motion clearly failed to direct the court's attention to the issue of immunity either before or after he presented his evidencethat issue was not preserved for review. The trial court, therefore, properly denied a judgment not withstanding the verdict on that ground.

II. Weight of the Evidence
Breland contends that he is entitled to a new trial on the ground that the verdict was against the weight of the evidence. Breland's version of the events that transpired during his attempt to arrest Ford differs from the version set forth above, principally in regard to the circumstances surrounding the deployment and use of Breland's pistol. In particular, Breland contends that he verbally informed Ford that he was under arrest when Ford exited his vehicle, and that Ford physically resisted arrest before entering his house. Most significantly, he insists that Ford was accidentally shot in the stomach as Ford was attempting to wrest the pistol from Breland.
Breland concedes that "[i]f the jury ... had believed the testimony of [Ford] that ... Breland shot him in the back without cause or justification, then a finding of wantonness and an award of punitive damages would clearly have been proper." Brief of Appellant, at 19. He deems as dispositive, however, the fact that the jury awarded only compensatory damages. He presents, in effect, the following syllogism: Ford's version of events would support a finding of wantonness, and, consequently, an award of punitive damages; because the jury did not award punitive damages, it did not accept Ford's version of events, and, therefore, must have believed Breland; the conduct the jury must have found wrongful must, then, have consisted merely of his having his pistol in his hand at the time of the injury.
These contentions are based on a misunderstanding of the relationship between wantonness claims and punitive damages. "[T]here is no such thing as a `claim of punitive damages.'" Hines v. Riverside Chevrolet-Olds, Inc., 655 So.2d 909, 925 (Ala. 1994). "[A] claim of wantonness is ... a claim on which ... a trier of fact has the authority in its discretion to impose punitive damages. A finding of wantonness, sufficiently supported, can legally support either an award of compensatory damages or an award of both compensatory and punitive *397 damages." Id. at 925-26 (emphasis in original). Thus, the fact that the jury awarded no punitive damages does not, as Breland contends, demonstrate that the jury believed his version.
Although Breland's testimony contradicted Ford's testimony in a number of respects, the jury was free to assign more credibility to Ford's version of events. That another jury might have done otherwise is of no consequence. "If there is substantial evidence presented, [and there was in this case,] it is the function of the jury, as the finder of facts, to weigh conflicting evidence and inferences, and to determine the credibility of the witnesses." John R. Cowley & Bros., Inc. v. Brown, 569 So.2d 375, 381 (Ala.1990). Moreover, "[j]ury verdicts are presumed to be correct." Pannell v. Reynolds, 655 So.2d 935, 939 (Ala.1994). "This presumption is strengthened when the trial court denies a motion for a new trial." Id. "So strong is this presumption that this Court will not reverse a judgment based on a jury verdict unless, after allowing all reasonable presumptions of correctness, the preponderance of the evidence against the verdict is so decided as to clearly convince this Court that it is wrong." Delchamps, Inc. v. Larry, 613 So.2d 1235, 1239 (Ala.1992). We cannot so conclude in this case.

III. Damages
Breland contends that the damages awarded were excessive. In support of this argument, he refers to the fact that in his complaint Ford sought only $1,000,000 and in his closing argument asked for $500,000. In returning a general verdict for $2,000,000 the jury must, Breland contends, have misunderstood the law or the facts of the case. We disagree with this contention.
It is well settled that a litigant seeking general damages for personal injuries, such as compensation for physical and emotional pain and suffering, may recover an amount in excess of the amount contained in the ad damnum clause of the complaint. Fuller v. Preferred Risk Life Ins. Co., 577 So.2d 878 (Ala.1991); see also Ala.R.Civ.P. 54(c). Indeed, the full measure of such damages, the ascertainment of which is not subject to "fixed standard[s]" or formulae, Alabama Power Co. v. Mosley, 294 Ala. 394, 401, 318 So.2d 260, 266 (1975), can be determined only by a jury after the trial of the cause. Consequently, "the amount of such award is left to the sound discretion of the jury, subject only to correction by the court for clear abuse or passionate exercise of that discretion." Id. "Our authority to disturb the verdict on the grounds of excessiveness is to be exercised with great caution. This is especially true where[, as here,] the trial court has refused a new trial or remittitur, thereby strengthening the presumption in favor of the jury's verdict." Stauffer Chemical Co. v. Buckalew, 456 So.2d 778, 783-84 (Ala.1984). Considering the severity of the physical and emotional injuries involved in this case, we conclude that our authority does not reach so far as to disturb the verdict of this jury.

IV. Improper Argument
Breland claims that the trial court erred in denying his motion for new trial because, he argues, Ford's lawyer made a "grossly improper and highly prejudicial" argument to the jury. During the closing argument of Ford's counsel, the following colloquy occurred:
"PLAINTIFF'S COUNSEL: Now, you heard all these folks and stuff that come in, and you've got to ask yourself why would they come in and try to pretend this was an accident? Why would they, you know, why would they come in here and tell us that? Because traditionally, law enforcement against alaw enforcement works with law enforcement. Officers would go in there and tell them [Ford] would get up andtell them: `You make [Ford] look bad.' He said he was drinking beer and they will believe it, that is why theythey didn't care anything about what he told you. Didn't think nothing about it. In the 50's, that would work. But this ain't the 50's. During your lifetime, a President of the United States has had to step down, so you know that Presidents are not above the law. That is why it won't work no more. Since the 50's, you have read the secret trials of J. Edgar *398 Hoover, the former F.B.I. director. That is why it won't work no more. Since the 50's, you have seen State Trooper Duncan, who shot another state trooper right down the road, that's why. Since the 50's, you have seen state troopers beat folks on the headthat's why it won't work any more.
"DEFENSE COUNSEL II: Your Honor, I'm going to object to that. It's not proper argument.
"COURT: Want to state your grounds?
"....
"DEFENSE COUNSEL II: Judge, we object to bringing this argument. It's clearly to inject racial issues. The defendant is white and the plaintiff is black, and he has skirted around this in his argument and there has been no objection to it. I think now he has crossed the line, and I think it's an objectionable comment.
"COURT: Anything from you?
"PLAINTIFF'S COUNSEL: No sir, Judge. I think it's proper.
"COURT: Okay. Overrule your objection.

"PLAINTIFF'S COUNSEL: Since the 50's, you know about Rodney King.[2]
"DEFENSE COUNSEL II: Your Honor, I object to that. It's totally irrelevant what happened in another case and the facts in this case.
"COURT: I'll sustain it.

"PLAINTIFF COUNSEL: [Ford] just didn't have no videotape.
"DEFENSE COUNSEL II: Your Honor, I object to that on the same grounds, what happened in some other case has nothing to do with this.
"COURT: I'll allow that comment, but I sustained the earlier objection.
"PLAINTIFF'S COUNSEL: If [Ford] had a videotape, you would have seen it for yourself. And then, ladies and gentlemen, since the 50's, we have had a Governor had to step down, so it's still where law enforcement just comes in and tells the jury something, it's over. This jury needs to say: `This day in our community, law enforcement [will] not run roughshod over our citizens.'"
(Emphasis added.) Breland contends that the comment regarding state troopers "beat[ing] folks on the head," in the 1950's, and the reference to Rodney King necessitated a new trial. The trial court overruled his objection to the first comment and sustained his objection to the second. As to the second comment, Breland did not request curative jury instructions or a mistrial. However, he contends that it was so prejudicial as to be ineradicable.
It is well established that "control of the argument of counsel is largely within the discretion of the trial judge, who observes the demeanor of counsel and can determine whether a prejudicial atmosphere is created by such remarks." Yesterday's, Inc. v. Lamey, 492 So.2d 988, 989 (Ala.1986). "Unless there is abuse of discretion by the trial court that results in substantial prejudice, this Court will not interfere with the trial court's ruling." Id. (Emphasis added.)
In addition, "[a]s a general rule, where a party's objection to improper argument is sustained, it is necessary for the party to request a corrective instruction from the trial court as a predicate for an appeal based on the prejudicial statement." Calvert & Marsh Coal Co. v. Pass, 393 So.2d 955, 958 (Ala. 1981) (emphasis added). "An exception to the requirement of requesting a corrective instruction has been recognized where the argument is so grossly improper and highly prejudicial that it could not have been cured by the trial court." Id. "There is no hard and fast rule as to when a remark made by counsel in closing argument is deemed to be so grossly improper and highly prejudicial as to be ineradicable from the minds of the jurors, notwithstanding a timely admonition from the trial judge." Hill v. Sherwood, 488 So.2d 1357, 1359 (Ala.1986). "Each case must be decided in light of the peculiar facts and circumstances involved and the atmosphere created in the trial of each particular case." Id. (Emphasis added.) For the following *399 reasons, we cannot conclude that either of the comments challenged by Breland warrants our interference with the trial court's rulings.
First, the most obvious import of Ford's "1950's" argument was merely that persons connected with governments or with law enforcement have, of late, been held accountable for their improper conduct. Any subtle allusion to racial conflict was blunted by the fact that the examples used, such as the removal of the Governor and the President, were indisputably race-neutral. Second, as Breland's counsel conceded in his argument to the trial court, he had allowed Ford to develop that theme for some time before objecting. Third, the most obvious import of his "Rodney King" argument was that Ford did not have the benefit of a videotape of the incident.
As we pointed out above in this opinion, the trial judge was in a better position than we are to weigh the effects of these remarks on the overall conduct of the trial. Yesterday's, supra. Considering these remarks within the entire context of the proceedings, we are unable to conclude that either, or both, of them worked "substantial prejudice," see id. 492 So.2d at 989, so as to require a reversal of the judgment.

V. Discrimination in Juror Selection
In selecting the jury for this case, Ford used 9 of his 10 peremptory challenges to remove white veniremembers from the jury panel; this resulted in a jury composed of 10 black jurors and 2 white jurors. Before the jury was empaneled and sworn, Breland contested the composition of the jury on the ground that the selection process violated constitutional equal protection guarantees. See Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). After Ford explained his strikes on the record, the trial court denied Breland's "Batson motion" and the jury was empaneled.
Breland now contends that Ford's explanations as to why he struck jurors No. 26, No. 59, and No. 66 were merely pretextual. These explanations were as follows:
"VENIREMEMBER 26: I noticed throughout the proceedings this morning that she was the only juror to be writing. I don't know if she was taking notes, but it appeared to me that she was taking notes and she distinguished herself by taking notes. I have had bad experience with people who take notes when other people don't.

"....
"VENIREMEMBER 59: [He] has a military background, he has also had an insurance agency for a long period of time here in Marion that I know about, and he was an ... independent agent. But he has had the experience of passing on and reviewing claims to determine liabilities.

"....
"VENIREMEMBER 66: [She] indicated that she was a client of mine and she is...."
(Emphasis added.)
The taking of notes by jurors is a practice having both proponents and critics. Silas, Write it Down? Jurors' Note Taking Debated, 70 A.B.A.J. 35, April 1984 (noting that as of 1979, "[f]ive states prohibited" the practice). Opposition is often predicated on the ground "that the juror who has taken the most notes may unduly influence other jurors during deliberation." Id. Another objection to the practice is that as a result, "`jurors may place too much emphasis on a point that may not be important.'" Id. Although Alabama does not prohibit jurors from taking notes, Glover v. State, 347 So.2d 592 (Ala. Crim.App.1977), the fact that the practice is prohibited in some states, and is discretionary with the trial court in other states, is sufficient to sustain a peremptory strike on that ground. As to veniremember No. 26, therefore, we cannot conclude that Ford's explanation was a sham or a pretext for racial discrimination.
We reach a similar conclusion as to Ford's explanation for his challenge to veniremember No. 59. Burlington Northern R.R. v. Whitt, 575 So.2d 1011 (Ala.1990), cert. denied, 499 U.S. 948, 111 S.Ct. 1415, 113 L.Ed.2d 468 (1991), involved a contention "that the trial court erred to reversal by permitting the plaintiff to inquire on voir dire *400 whether any member of the venire was an insurance adjuster." Id. at 1017. In holding that the question was valid, this Court explained:
"Besides, we believe that the question `Anybody here who is an insurance adjuster?' was proper. It is undisputed that attorneys have the broad right to question venire members as to any matter that might disclose a prospective juror's bias, prejudice, or interest in the outcome of a trial.... In attempting to strike a fair and impartial jury, attorneys have a legitimate interest in learning about any associations the venire has with the case, including the kind of work the prospective jurors and members of their families engage in.
"`It is a fact of life that no matter how honest and conscientious an individual may be, he is most likely to be influenced, if not actually biased, by his past or present occupational experiences.'

"Landers v. Long, 53 Ala.App. 340, 343, 300 So.2d 112, 114 (Ala.Civ.App.1974)."
575 So.2d at 1018. The "past or present occupational experiences" of veniremember No. 59 were a subject of valid inquiry, particularly as to their potential to affect his view of the proper amount of compensation or other damages for Ford's injuries. We cannot, therefore, conclude that the challenge of veniremember No. 59 on the ground that he might be influenced by his occupational expertise in evaluating claims was a sham or pretext for racial discrimination.
Finally, the sufficiency of Ford's explanation for striking veniremember No. 66, who was a client of Ford's counsel, requires no protracted discussion. The explanation was clearly race-neutral. For these reasons, the trial court did not err in overruling Breland's "Batson "motion.
There being no grounds for reversing of the trial court's judgment, it is affirmed.
AFFIRMED.
ALMON, SHORES, KENNEDY, and BUTTS, JJ., concur.
HOOPER, C.J., and MADDOX, J., dissent.
MADDOX, Justice (dissenting).
The appellant, James Breland, an Alabama state trooper, appeals from a judgment entered on a jury verdict awarding $2,000,000 in compensatory damages. He claims that he was entitled to a new trial on the grounds (1) that he enjoyed substantive immunity under state law and therefore was entitled to a judgment as a matter of law; (2) that the verdict was against the weight of the evidence; (3) that the damages awarded were excessive; and (4) that "[c]ertain argument of counsel for the plaintiff was so grossly improper and ... prejudicial as to require a new trial."
I believe that grounds (1) and (4) of Breland's motion have merit; therefore, I must respectfully dissent.
Although I realize, as the majority states, that "many of the facts pertinent to this case are in dispute," and that a jury question was presented, it appears to me that many of the facts surrounding the events that gave rise to this action are not included in the majority opinion. Therefore, in support of my dissenting opinion, I include facts not contained in the majority opinion that I believe are pertinent in this case.
The plaintiff, Gene Kelvin Ford, was traveling at 82 miles an hour (Defendant's Exhibit 7) when Officer Breland began pursuit. Ford failed to stop, and the pursuit ended at Ford's residence. Much of this incident occurred during the night hours, according to testimony by the witnesses for Ford. Officer Breland testified that Ford resisted arrest and ran into his residence and that he followed Ford and a struggle ensued. There are no witnesses as to what happened between the time that Officer Breland began pursuit and the time leading up to the shooting. At approximately 8:00 p.m. Ford was shot in his residence; after being shot, he was rushed to a hospital, and around 10:00 p.m. a blood sample was taken from Ford; that sample evidenced a blood alcohol content of .132%.[3] Ford contends that he was *401 shot in the back at a distance of approximately 15 feet. However, Dr. Clyde Cox, who initially treated Ford, testified that the bullet entered Ford through the abdomen and exited the back. A forensic firearms expert testified that there were powder burns on the front of the sweater Ford was wearing during the incident; which indicates that the gun could have been no more than 24 inches away from Ford's abdomen when Ford was shot.

The Immunity Argument
I first address Breland's claim that he enjoyed substantive immunity under state law and is therefore entitled to a judgment as a matter of law. The majority does not address this claim, but instead agrees with Ford's contention that Breland failed to move for a directed verdict on the basis of immunity at any point in the trial.
I have read the record as it pertains to this issue, and I interpret what was done and said differently than does the majority. The majority elects to leave out a portion of the colloquy that I believe sustains my view that Breland raised the claim of substantive immunity in his motions for a directed verdict. Although the majority sets out a portion of the colloquy between the trial judge and counsel relating to this issue, and indicates that portions of it are omitted, I am setting out the entire colloquy, to give the reader a better understanding of the reason for my disagreement:

AT THE CLOSE OF THE PLAINTIFF'S EVIDENCE:
"DEFENSE COUNSEL NO. I: Your Honor, you ready for us to make our motion? I would move for a directed verdict on the part of Tom Wells, Thomas McGee, George Jones, and Roy Calvin on the basis that ... the plaintiff put [nothing] into evidence that there was any lack of supervision or training on their parts with regard to Trooper Breland. Under the Section 1983 claim, the plaintiff has to prove some lack of training or supervision that was the proximate cause of the injury that the individual suffered. And again, in this case, they have simply put no evidence to show any lack of training or supervision of Trooper Breland by any of the defendants who I have just named. As to their state law claims against these defendants, again, they would have to show that same thing, which they haven't. In addition, the defendants, under state law, enjoyed a substantive immunity from suit for discretionary functions.

"PLAINTIFF'S COUNSEL: Your Honor, we understand the motion. We don't agree, but with respect to the motion in limine that you [sic] filed and the proof we have made, we don't have any further argument with respect to the individual defendants other than Mr. Breland.
"THE COURT: Okay.
"DEFENSE COUNSEL NO. II: Likewise, your Honor, we would file the same motion for directed verdict on behalf of Mr. Breland simply on the grounds that plaintiff has failed to prove [his] cause of action.
"THE COURT: Okay.
"PLAINTIFF'S COUNSEL: Would you like me to address that, Your Honor?
"THE COURT: If you want to.
"PLAINTIFF'S COUNSEL: Your Honor, we basically are pursuing three claims against Mr. Breland. And the evidence yesterdayfirst, deprivation of civil rights. I think the evidence is clear [that] he shot the man under cover of law. We are maintaining a claim for negligent and wanton conduct of Mr. Breland in the shooting, and a direct assault and battery. Right now I think the evidence amply substantiates [that] all those things occurred and that the jury could easily find for the plaintiff on all the required elements of these causes of action based on the testimony that you have got here before you today.
"DEFENSE COUNSEL I: Your Honor, we would just add that, again, in order to establish cause of action [under §] 1983, you have to show some sort of history of misconduct on the part of the officer to put *402 the defendants on notice for the need of improved supervision and training. And again, they submitted no such evidence in this case.
"THE COURT: Okay. Your motion is granted except as to the defendant Breland."

(R. 90-92; emphasis added.)

AT THE CLOSE OF ALL THE EVIDENCE:
"DEFENSE COUNSEL I: Your Honor, if they are resting, we would like to make our motion for directed verdict on behalf of Trooper Breland. And the basis of our motion would be that under the evidence presented in this case, the only testimony being by Mr. Ford [the plaintiff] that he was shot in the back is contradicted by evidence from Dr. Cox, evidence from Mr. Harden, evidence from Roscoe Howell ... that no reasonable jury, under the evidence as presented to the court could find that the plaintiff in this case was, in fact, shot in the back by Trooper Breland and that a directed verdict should be entered in his favor.
"THE COURT: Okay. It's denied. Now"
(R. 240.)
The majority emphasizes portions of the colloquy that it says supports its view, and then it states:
"These emphasized excerpts clearly demonstrate that the only ground ever assigned for Breland's directed verdict motions was that Ford had failed to present substantial evidence, as required by Ala. Code 1975, § 12-21-12, of any misfeasance. In other words, the basis for Breland's motion `simply ... that [the] plaintiff has failed to prove [his] cause of action (emphasis added [in the majority opinion])'stands in stark contrast to the bases for the co-defendants' motions.
"... Because Breland's motion clearly failed to direct the court's attention to the issue of immunityeither before or after he presented his evidencethat issue was not preserved for review. The trial court, therefore, properly denied a judgment not withstanding the verdict on that ground. [Emphasis added.]"
I believe that a fair reading of the full colloquy shows that the issue of Breland's immunity was called to the attention of the trial court at the proper times. Furthermore, the majority's statement that the attention of the trial court was not called to the immunity issue "either before or after" Breland presented his evidence seems to be incorrect. (R. 90-91.)
The record shows: (1) that the defendants called the defense of immunity to the attention of the court in their answer (R. 26); and (2) that the plaintiff then amended his complaint in order to counter (R. 31). Quoted above are the defendant's motions for directed verdict, one made after the close of the plaintiff's evidence, and one made at the close of all the evidence as required under Rule 50(b), Ala.R.Civ.P.
In addition, at the close of the plaintiff's case, the trial judge treated the motion of counsel for the Department of Public Safety (referred to in those portions of the record quoted above as DEFENSE COUNSEL I), and the motion of counsel for Trooper Breland (referred to in those portions of the record quoted above as DEFENSE COUNSEL II), as one motion, stating: "Okay. Your motion is granted except as to the defendant Breland." (Emphasis added.) Under Alabama law, "[a] specific ground is not required and a general objection will suffice if the ground `is so manifest that the court and counsel cannot fail to understand it.'" Rule 46, Ala.R.Civ.P.; Holt v. State Farm Mut. Auto. Ins. Co., 507 So.2d 388 (Ala.1986).
Based on the foregoing, I cannot agree with the majority that Breland did not raise the issue of substantive immunity. Taylor v. Shoemaker, 605 So.2d 828 (Ala.1992); Barnes v. Dale, 530 So.2d 770 (Ala.1988) (a defense of qualified immunity made by a motion for summary judgment preserved the issue for appellate review, even if a motion for directed verdict was not made at the close of all the evidence).

*403 The Claim of Improper Argument

I now address that portion of the majority opinion that holds that the comments made by the plaintiff's counsel in closing arguments to the jury were not prejudicial. I cannot agree with that conclusion. I set out the argument again, and the specific objection that was made at the time about the argument, to show why I believe the argument was highly improper:
"PLAINTIFF'S COUNSEL: Now, you heard all these folks and stuff that come in, and you've got to ask yourself why would they come in and try to pretend this was an accident? Why would they, you know, why would they come in here and tell us that? Because traditionally, law enforcement against alaw enforcement works with law enforcement. Officers would go in there and tell them Kelvin would get up andtell them: `You make Kelvin look bad.' He said he was drinking beer and they will believe it, that is why theythey didn't care nothing about what he told you. Didn't think nothing about it. In the 50's, that would work. But this ain't the 50's. During your lifetime, a President of the United States has had to step down, so you know that Presidents are not above the law. That's why it won't work no more. Since the 50's, you have read the secret trials of J. Edgar Hoover, the former F.B.I. director. That's why it won't work no more. Since the 50's, you have seen State Trooper Duncan, who shot another state trooper right down the road, that's why. Since the 50's, you have seen state troopers beat folks on the head that's why it won't work any more.

"DEFENSE COUNSEL II: Your Honor, I'm going to object to that. It's not proper argument.
"COURT: Want to state your grounds?
"....
"DEFENSE COUNSEL II: Judge, we object to bringing this argument. It's clearly to inject racial issues. The defendant is white and the plaintiff is black, and he has skirted around this in his argument and there has been no objection to it. I think now he has crossed the line, and I think it's an objectionable comment.
"COURT: Anything from you?
"PLAINTIFF'S COUNSEL: No sir, Judge. I think it's proper.
"COURT: Okay. Overrule your objection.

"PLAINTIFF'S COUNSEL: Since the 50's, you know about Rodney King.
"DEFENSE COUNSEL II: Your Honor, I object to that. It's totally irrelevant what happened in another case and the facts in this case.
"COURT: I'll sustain it.

"PLAINTIFF'S COUNSEL: Kelvin just didn't have no videotape"
"DEFENSE COUNSEL II: Your Honor, I object to that on the same grounds, what happened in some other case has nothing to do with this.
"COURT: I'll allow that comment, but I sustained the earlier objection.
"PLAINTIFF'S COUNSEL: If Kelvin had a videotape, you would have seen it for yourself. And then, ladies and gentlemen, since the 50's, we have had a Governor had to step down, so it's still where law enforcement just comes in and tells the jury something, it's over. This jury needs to say: `This day in our community, law enforcement [will] not run roughshod over our citizens ...'"
(R. 259-62; emphasis added.)
This case involves alleged interracial violence, and when a case involves interracial violence the risk of improper influence on the jury is great and the chance that comments will be eradicated from the minds of the jury is small. Turner v. Murray, 476 U.S. 28, 106 S.Ct. 1683, 90 L.Ed.2d 27 (1986). Consequently, a trial judge in this kind of case should make every effort to ensure that comments like those presented in this case are not made. The remarks of counsel in this case were intended to evoke racial prejudice and never should have been allowed.
I fully realize that the trial judge has discretion to determine whether a particular comment or remark is prejudicial; however, "the appellate courts of this state scrutinize very carefully the injection of any issue, by argument or otherwise, that is calculated to *404 create in the minds of the jury ineradicable bias or prejudice that factorially motivates a verdict." Donald v. Matheny, 276 Ala. 52, 57, 158 So.2d 909 (1963). Additionally, "[t]his Court has frequently held [that] an appeal to race prejudice constitutes a most serious breach of the privilege of argument to the jury, and such appeals have met with frequent condemnation by this Court." Loeb v. Webster, 213 Ala. 99, 102, 104 So. 25, 27 (1925). See also, Stallworth v. Holt, 534 So.2d 1063 (Ala.1988) (remarks by counsel commenting on the wealth of the defendants held improper); McLemore v. International Union, etc., 264 Ala. 538, 88 So.2d 170 (1956) (counsel's remarks to the jury ruled to be grossly improper and beyond eradication by the trial court); Brotherhood of Painters, Decorators & Paperhangers of America v. Trimm, 207 Ala. 587, 93 So. 533 (1922) (statement by counsel that defendant was a nonresident ruled highly improper); Thomas v. Posey, 15 Ala.App. 419, 73 So. 747 (1916) (comments to the jury by counsel concerning the race of the parties held highly improper); Davis v. Common Council of Alexander City, 137 Ala. 206, 33 So. 863 (1903) (argument of counsel ruled not in evidence and not legally competent or admissible as evidence). In fact, the law in the area of prejudicial remarks is that while there must normally be an objection by counsel or a motion to exclude and a ruling by the trial court in order to preserve an improper argument of counsel as a ground for new trial and for a review on appeal, there is an exception where it can be shown that counsel's remarks were so grossly improper and highly prejudicial as to be beyond corrective action by the trial court. Patrick v. Femco Southeast, Inc., 590 So.2d 259 (Ala.1991); Hill v. Sherwood, 488 So.2d 1357 (Ala.1986); Alabama Power Co. v. Henderson, 342 So.2d 323 (Ala.1977). Here, the trial judge's attention was sufficiently called to the improper argument; he understood the objection, and he overruled it.
Although I realize that this is a civil case rather than a criminal action, I note that it is well established by the American Bar Association Standards for Criminal Justice and by caselaw from other jurisdictions that a lawyer should not use arguments calculated to inflame the passions or prejudices of the jury. Remarks that rely on racial, religious, or ethnic prejudice wrongfully introduce elements of irrelevance and irrationality into the trial and should never be made in a court of justice. "Prosecutor's Appeal to Prejudice," 70 A.L.R. 4th 664, 670 (1989); Jackson v. Chicago Transit Authority, 133 Ill.App.2d 529, 273 N.E.2d 748 (1971); Kornegay v. State, 174 Ga.App. 279, 329 S.E.2d 601 (1985); ABA Standards for Criminal Justice, § 3-5.8(c) (1982).
I recognize, of course, that "[t]here is no hard and fast rule as to when a remark made by counsel in closing argument is deemed to be so grossly improper and highly prejudicial as to be ineradicable from the minds of the jurors, notwithstanding a timely admonition from the trial judge,"[4] and that "[e]ach case must be decided in light of the peculiar facts and circumstances involved, and the atmosphere created, in the trial of each particular case."[5] The circumstances surrounding the trial of this case were such that an appeal to racial prejudice would have been especially prejudicial to the defendant. Therefore, I must dissent on the grounds that the comments made by the plaintiff's attorney in closing arguments were so grossly improper that they were beyond eradication by the trial judge.
HOOPER, C.J., concurs.

On Application For Rehearing
COOK, Justice.
On May 3, 1996, when this Court issued its original opinion, Justice Maddox issued a dissent, which was joined by Chief Justice Hooper. Justice Maddox, in that dissenting opinion, specifically disagreed with the holding in Part IV. Today, Chief Justice Hooper also writes a dissent, specifically directed to Part IV. These dissents suggest that Trooper Breland should be granted a new trial because, it is asserted, plaintiff's counsel made prejudicial and racially inflammatory references in his closing argument to the *405 jury. It is readily apparent, upon an examination of counsel's argument, that the words used, fairly and reasonably construed, and the thoughts conveyed are related to, and suggest circumstances relating to, alleged abuse of authority, rather than to an appeal, veiled or otherwise, to race. Consequently, we deem it expedient to address specifically the objections common to the two dissents.
Both dissents quote, and consider objectionable, that portion of Ford's closing argument we addressed in Part IV of our opinion on original submission. Although we have already fully set forth that excerpt in Part IV, we shall repeat it here and parse it, segment by segment, to illustrate why none of this argument appeals to racial passion, as the dissenting Justices propose:
"PLAINTIFF'S COUNSEL: Now, you heard all these folks and stuff that come in, and you've got to ask yourself why would they come in and try to pretend this was an accident? Why would they, you know, why would they come in here and tell us that?
"[1] Because traditionally, law enforcement against alaw enforcement works with law enforcement. Officers would go in there and tell them ...tell them: `You make [Ford] look bad.' He said he was drinking beer and they will believe it, that is why theythey didn't care anything about what he told you. Didn't think nothing about it. In the 50's, that would work. But this ain't the 50's.
"[2] During your lifetime, a President of the United States has had to step down, so you know that Presidents are not above the law. That is why it won't work no more.
"[3] Since the 50's, you have read the secret trials of J. Edgar Hoover, the former F.B.I. director. That is why it won't work no more.
"[4] Since the 50's, you have seen State Trooper Duncan, who shot another state trooper right down the road, that's why.
"[5] Since the 50's, you have seen state troopers beat folks on the headthat's why it won't work anymore.
"[6] Since the 50's, you know about Rodney King.
"[7] [Ford] just didn't have no videotape. If [Ford] had a videotape, you would have seen it for yourself.
"[8] And then, ladies and gentlemen, since the 50's, we have had a Governor [who] had to step down....
"[9] This jury needs to say: `This day in our community, law enforcement [will] not run roughshod over our citizens.'"
Segment One, by the force of its terms, suggests that law enforcement officials tend to side with one another against opposition, and that testimony of law enforcement officers was "[i]n the 50's" always and inherently more credible than conflicting testimony of a witness not in law enforcement. Segment One clearly makes no implication to race, but rather is grounded on a suggestion of the closeness of law enforcement personnel and the persuasive influence of the testimony of a law enforcement officer to the jury. Whether this argument was objectionable on other grounds will not be further addressed. We examined in Part IV of our original opinion the necessity of an appropriate objection.
Segment Two refers to the late President Richard Nixon, who was forced to resign his office as a result of the break-in of the Watergate building and the subsequent coverup. The resultant scandal involved no racial issues. Instead, as is commonly known, the keynote phrase of the Watergate scandal was abuse of power. Thus, the argument contained in Segment Two must be understood as a reference not to racial passion, but to abuse of power.
Similarly, Segment Eight refers to former Alabama Governor Harold Guy Hunt, who was removed from office pursuant to his conviction for violating Ala.Code 1975, § 36-25-5(a), which, at the time of his conviction, stated: "No public official or employee shall use an official position or office to obtain direct personal financial gain for himself, or his family, or any business with which he or a member of his family is associated unless such use and gain are specifically authorized by law." (Emphasis added.) See Ex parte Hunt, 642 So.2d 1060 (Ala.1994). Governor Hunt's conviction and removal from office involved no racial issues. Instead, as is apparent *406 from the face of § 36-25-5(a), the essence of the offense is abuse of power. Thus, the essence of the argument contained in Segment Eight is not an appeal to racial prejudice, but to abuse of power.
Segment Three refers to the recently publicized practices of one-time FBI Director J. Edgar Hoover, who allegedly used his position to harass a broad cross-section of the population. Thus, Ford's reference to Hoover can reasonably be construed not as an appeal based on race, but as an allusion to abuse of law enforcement power.
Of a similar import was the argument contained in Segment Four, which refers to the trial and conviction of a male state trooper for the murder of a female state trooper to whom he was engaged to be married. See Duncan v. State, 575 So.2d 1198 (Ala.Crim. App.1990), cert. denied, 575 So.2d 1208 (Ala. 1991), on return to remand, 612 So.2d 1304 (Ala.Crim.App.1992) (conviction reversed and cause remanded). The case was devoid of racial overtones; therefore, Ford's reference to it was, again, to remind the jury of its responsibility to recognize and rectify abuses of law enforcement power. To this end, of course, was Segment Nine offered, which exhorted the jury to say: "This day in our community, law enforcement [will] not run roughshod over our citizens."
Segments Five, Six and Seven all refer to the Rodney King incident. Though King is black, as is Mr. Ford, the fact that both are members of the same ethnic group, standing alone, does not implicate a race-based appeal in the argument. Additionally, the trial court sustained the objection to Ford's counsel's reference to the King case. Indeed, taking these segments as an integrated whole impresses the listener not with the fact of King's ethnicity, but the fact that a video recording was made of the beating King received. More specifically, in Segment Five counsel said: "Since the 50's you have seen state troopers beat folks...." (Emphasis added.) If any doubt existed as to the point of the argument in Segments Five and Six, it was dispelled in Segment Seven, in which he stated: "[Ford] just didn't have no videotape. If [Ford] had a videotape, you would have seen it for yourself." (Emphasis added.)
For these reasons, we conclude that the argument was not an appeal to racial prejudice or passion and was not improper, as the dissenting Justices propose. There being no reason to disturb the original holding in this case, the application for rehearing is overruled. This extension shall not be construed as a substantial modification of the original opinion for purposes of filing a second application for rehearing. See Ala.R.App.P. 40.
OPINION EXTENDED; APPLICATION OVERRULED.
ALMON, SHORES, KENNEDY, and BUTTS, JJ., concur.
HOOPER, C.J., and MADDOX, J., dissent, each with opinion.
HOOPER, Chief Justice (dissenting).
The evidence does not support the jury verdict. A substantial injustice will occur if this Court allows the jury's verdict of $2,000,000 to stand. Gene Ford alleges that he was assaulted and shot in the back by State Trooper James Breland, without justification. The only evidence to support this claim is the plaintiff's own disputed and self-serving testimony.
State Trooper Breland's speed-detection device recorded Ford speeding, and Trooper Breland pursued Ford. Breland testified that he attempted to arrest Ford, but that Ford fought him; that he struck Ford during the struggle; that Ford then ran into his trailer, and that Breland pursued him there; that he and Ford fought on the couch in the front of Ford's trailer; that Ford grabbed the barrel of Breland's pistol and that the pistol then fired and Ford was shot in the stomach.
Ford claims that he got out of his car and that Breland struck him with his pistol, without provocation; that he ran into the back of his trailer; and that Breland shot him in the back as he was bending over to pick up one of his children.
Dr. Clyde Cox, the physician who treated Ford, testified that the bullet that struck Ford entered his abdomen and exited his back. Further, there was gunpowder residue *407 on the front of Ford's sweater where he was struck by a bullet and gunpowder around the crotch area of his pants where a bullet had passed between his legs.
Laura Chevlin, an employee of the Department of Forensic Sciences, testified that a blood sample taken from the plaintiff after the shooting revealed a blood alcohol level of.132%. Ford claims that he had not been drinking that evening. The physical evidence clearly supports Breland's testimony and contradicts Ford's claims. The jury could not reasonably have ruled in Ford's favor.
Further, during closing argument counsel for the plaintiff made prejudicial and racially inflammatory statements that should have resulted in a mistrial:
"PLAINTIFF'S COUNSEL: Now, you heard all these folks and stuff that come in, and you've got to ask yourself why would they come in and try to pretend this was an accident? Why would they, you know, why would they come in here and tell us that? Because traditionally, law enforcement against alaw enforcement works with law enforcement. Officers would go in there and ... would get up andtell them: `You make Kelvin look bad.' He said he was drinking beer and they will believe it, that is why theythey didn't care nothing about what he told you. Didn't think nothing about it. In the 50's, that would work. But this ain't the 50's. During your lifetime, a President of the United States has had to step down, so you know that Presidents are not above the law. That's why it won't work no more. Since the 50's, you have read the secret trials of J. Edgar Hoover, the former F.B.I. director. That's why it won't work no more. Since the 50's you have seen State Trooper Duncan, who shot another trooper right down the road, that's why. Since the 50's, you have seen state troopers beat folks on the headthat's why it won't work anymore.
"DEFENSE COUNSEL II: Your Honor, I'm going to object to that. It's not proper argument.
"THE COURT: Want to state your grounds?
"....
"DEFENSE COUNSEL II: Judge, we object to bringing this argument. It's clearly to inject racial issues. The defendant is white and the plaintiff is black, and he has skirted around this in his argument and there has been no objection to it. I think now he has crossed the line, and I think it's an objectionable comment.
"THE COURT: Anything from you?
"PLAINTIFF'S COUNSEL: No sir, Judge. I think it's proper.
"THE COURT: Okay. Overrule your objection.
"PLAINTIFF'S COUNSEL: Since the 50's, you know about Rodney King
"DEFENSE COUNSEL II: Your Honor, I object to that. It's totally irrelevant what happened in another case and the facts in this case.
"THE COURT: I'll sustain it.
"PLAINTIFF'S COUNSEL: Kelvin just didn't have no videotape"
"DEFENSE COUNSEL II: Your Honor, I object to that on the same grounds, what happened in some other case has nothing to do with this.
"THE COURT: I'll allow that comment, but I sustained the earlier objection.
"PLAINTIFF'S COUNSEL: If Kelvin had a videotape, you would have seen it for yourself. And then, ladies and gentlemen, since the 50's, we have had a Governor [have] to step down, so it's still where law enforcement just comes in and tells the jury something, it's over. This jury needs to say: `This day in our community, law enforcement [will] not run roughshod over our citizens.' This jury needs to say this day that all men are created equal and they are endowed by a creator with certain unalienable rights, and among those rights is life, liberty, and the pursuit of happiness. And then this jury needs to say today that Kelvin Ford is a man that is entitled to those rights. This jury also needs to say that Kelvin Ford was deprived of those rights by one person who decided to be the judge and the jury. If this jury does not say this today, it will get *408 worse, because you will have given them the authority to do that now.
"DEFENSE COUNSEL II: Your Honor, I'm going to object to that. This jury has no power to give any authority to anyone, simply to try the facts of this case.
"THE COURT: There is only one case before this jury and it's this case that's being tried today."
(R. 259-62.)
Plaintiff's counsel was clearly trying to inflame the jury by making racially charged references. Plaintiff's counsel stated: "Since the 50's, you have seen state troopers beat folks on the headthat's why it won't work anymore." This remark was a reference to police brutality toward blacks and civil rights activists during the 60's. The trial judge overruled defense counsel's objection to this remark. Plaintiff's counsel then referred to Rodney King. The trial judge sustained defense counsel's objection, but failed to instruct the jury to disregard the remark or make any attempt to prevent prejudice to the trial. The next remark of plaintiff's counsel was: "Kelvin just didn't have no videotape." The trial judge overruled defense counsel's objection to this remark. Plaintiff's counsel was clearly referring to the Rodney King case, out of Los Angeles, California, a case in which a black man was beaten by white police officers. The police beating of Rodney King was captured on videotape, and the video of the beating received great publicity. Plaintiff's counsel was implying that the same kind of police brutality took place in this case, only without a video of the event. These remarks were designed to inflame the passions of the jury by making references to police brutality toward blacks; counsel was trying to say that the actions of others in totally unrelated cases demonstrated that the defendant in this case was guilty of racially motivated police brutality.
"This Court has frequently held [that] an appeal to race prejudice constitutes a most serious breach of the privilege of argument to the jury, and such appeals have met with frequent condemnation by this court." Loeb v. Webster, 213 Ala. 99, 102, 104 So. 25, 27 (1925). An appeal to racial prejudice is often an appeal to a jury's fears. Such was the case in this trial. Plaintiff's counsel brought up other incidents of police brutality to try to inflame the emotions of the black jurors so they would render a verdict for the plaintiff. The reason given by plaintiff's counsel for a plaintiff's verdict was to guard against even greater racism happening in the future. Plaintiff's counsel presented Trooper Breland as a symbol of all the racist injustice against blacks, past and future, and suggested that it was, therefore, the jury's duty to return a verdict for the plaintiff.
In order to support a motion for a new trial, based on a claim of improper arguments, a party does not have to demonstrate that a party's inflaming remarks actually influenced the jury's verdict. "The test of vitiating influence is not that it did influence a member of the jury to act without the evidence, but that it might have unlawfully influenced that juror and others with whom he deliberated, and might have unlawfully influenced its verdict rendered." Roan v. State, 225 Ala. 428, 435, 143 So. 454, 460 (1932). The remarks by plaintiff's counsel were designed to improperly influence the jury's decision. The jury could not properly consider racial incidents that had no relation to this case and that had occurred at different times over a period of 30 or 40 years. The inflammatory nature of these comments is self-evident.
This Court held in McLemore v. International Union, 264 Ala. 538, 88 So.2d 170 (1956), that certain remarks by the plaintiff's counsel tending to inflame racial passions created an ineradicable prejudice and, therefore, that the trial court had properly granted a new trial:
"We are convinced that under the circumstances existing in this case, ... the argument of counsel was `"`so grossly improper and highly prejudicial, that its evil influence and effect could not be eradicated from the minds of the jury by any admonition from the trial judge'"'. National Biscuit Co. v. Wilson, 256 Ala. 241, 54 So.2d 492, 497; Alabama Great Southern R. Co. v. Gambrell, 262 Ala. 290, 78 So.2d 619."
264 Ala. at 544, 88 So.2d at 174-75.
The trial court made no attempt to eradicate the harm caused by the racially inflammatory *409 remarks in this case. However, even if the trial judge had made such an attempt, a new trial would have been required. The jury heard the remarks of the plaintiff's counsel, and those remarks ineradicably tainted the trial as a result. The legal system must maintain the appearance of justice as well as the substance of justice. The trial judge failed to uphold the appearance of justice, by allowing a party to make racially inflammatory remarks, by not attempting to eradicate their effect, and by not granting a new trial upon the defendant's motion. For all these reasons, I would grant the application for rehearing and would reverse the order of the trial court denying the defendant's motion for a new trial.
MADDOX, Justice (dissenting).
In my dissent of May 3, 1996, on original deliverance, I said the following about the closing argument:
"The circumstances surrounding the trial of this case were such that an appeal to racial prejudice would have been especially prejudicial to the defendant. Therefore, I must dissent on the grounds that the comments made by the plaintiff's attorney in closing arguments were so grossly improper that they were beyond eradication by the trial judge."
693 So.2d at 404.
The majority, on rehearing, has extended the opinion, and in the words of the extended opinion, has "repeat[ed] ... and parse[ed] [counsel's argument], segment by segment, to illustrate why none of this argument appeals to racial passion, as the dissenting Justices propose."
My views on the prejudicial effect of the argument are not changed, and I question whether the majority should engage in a laboratory analysis of it, as it does in the extended opinion, especially in view of the principle of law that "we ... must consider the argument as it appears in the record devoid of counsel's intentions in connection therewith." Allison v. Acton-Etheridge Coal Co., 289 Ala. 443, 448, 268 So.2d 725, 730 (1972).
NOTES
[1] While Ford was thus gripping the sides of the pistol, the semi-automatic mechanism would not operate, Breland testified, and, consequently, the pistol would not continue to fire.
[2] This reference to Rodney King is an apparent reference to the black motorist stopped and beaten by police officers in Los Angeles, California. That beating incident was recorded on videotape and was given much coverage in the news media. It occurred in 1991.
[3] This test indicates that Ford was legally intoxicated at 10:00 p.m., which is approximately 2 hours after Officer Breland entered Ford's home. Despite this scientific evidence, Ford testified that he only consumed one beer the night of the shooting.
[4] Hill v. Sherwood, 488 So.2d 1357, 1359 (Ala. 1986).
[5] Id.