## S98A1777. BRADY v. THE STATE.
(513 SE2d 199)

HINES, Justice.

Kenneth Lamar Brady appeals his convictions for two counts of malice murder and two counts of armed robbery in connection with the killings of Tony and Kathy Reid.[1] For the reasons which follow, we affirm.

Brady was tried with co-defendant Avery; another co-indictee, Robertson, was tried separately.[2] Viewed to support the verdicts, the evidence showed that the Reids were murdered in their home in Forsyth County. They were found lying face down on the floor of the dining room, both shot in the head. Kathy Reid had also been shot in the leg. The crime scene revealed bloody footprints, matching Avery's shoe size, leading from the bodies to the doorway.

After the crimes, Brady spoke several times with Hammett, who surreptitiously taped several of the conversations. Brady told Hammett that he killed two people in Forsyth County, although he did not name them. He also stated that he and Avery, with the help of a "set-up man," had planned and executed the crimes, but that he, Brady, had not gone into the house and that if he had the killings might not have occurred.

A ring Brady had given his girlfriend was identified as belonging to Kathy Reid, and a set of keys Brady had left at his girlfriend's house contained a key to the time clock at Tony Reid's place of business, and a key that fit several lock boxes there. Brady told his girlfriend that he and another person had "gone in on" some people, that the people had "balked," that he and his accomplice "had to do what they had to do," and that he, Brady, had killed a woman.

1. The evidence was sufficient to enable the jury to find beyond a reasonable doubt that Brady was guilty of the crimes of which he was convicted. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. On the second day of jury voir dire, a juror informed the court

---

[1] The crimes took place on December 18-19, 1989. On October 10, 1993, Brady, together with Avery and Robertson, was indicted on two counts of malice murder and two counts of armed robbery. After a joint trial with Avery which took place March 14-28, 1994, Brady was convicted on all counts, and on March 29, 1994, was sentenced to two consecutive terms of life imprisonment for the murder convictions; for the armed robbery convictions, he was sentenced to two additional life terms, concurrent with each other but consecutive to the second life sentence for murder. He filed a notice of appeal on April 26, 1994, an appeal was docketed in this Court on February 9, 1998, and that appeal was remanded on May 6, 1998. Brady filed a motion for new trial on May 12, 1998, which was denied on July 3, 1998. He filed a notice of appeal on July 30, 1998, and his appeal was docketed in this Court on August 5, 1998. The case was orally argued on November 9, 1998.

[2] Avery and Robertson were also found guilty of the crimes. See *Avery v. State*, 269 Ga. 584 (502 SE2d 230) (1998); *Robertson v. State*, 268 Ga. 772 (493 SE2d 697) (1997).

that she now realized that the family that serviced the lawns at her home and business was related to the victims, apparently as cousins. She had not discussed the case with them but stated that this connection to the victims' family "possibly" could affect her ability to properly judge the case. When the court asked if she would be able to put aside this relationship and decide the case based on the evidence and instructions she responded, "I will try." The court denied Brady's motion to remove this juror for cause.

Whether to strike a juror for cause lies within the sound discretion of the trial court. *Garland v. State*, 263 Ga. 495, 496 (1) (435 SE2d 431) (1993). Before a juror is to be excused for cause, it must be shown that he or she holds an opinion of the guilt or innocence of the defendant that is so fixed and definite that the juror will be unable to set the opinion aside and decide the case based upon the evidence or the court's charge upon the evidence. Id.; *McClain v. State*, 267 Ga. 378, 380 (1) (a) (477 SE2d 814) (1996). The fact that a juror states he or she "will try" to follow the court's instructions does not, by itself, require that the juror be excused for cause. See *Holmes v. State*, 269 Ga. 124, 126 (2) (498 SE2d 732) (1998); *Garland*, supra. A conclusion on an issue of bias is based on findings of demeanor and credibility which are peculiarly in the trial court's province, and those findings are to be given deference. *Greene v. State*, 266 Ga. 439, 441 (2) (469 SE2d 129) (1996).

The juror's revelation and responses did not reveal any compelling bias or interest in the case. See *Garland*, supra at 497. The juror informed the court of the connection with the victims' family because she believed she was required to; she did not suggest any personal experiences that might affect her decision, see *Johnson v. State*, 262 Ga. 652, 653 (2) (424 SE2d 271) (1993), nor did she state that she had a prejudice or bias against Brady, compare *Menefee v. State*, 270 Ga. 540 (2) (512 SE2d 275) (1999). There was no indication that she had formed an opinion about Brady's guilt or innocence, and the court did not abuse its discretion in refusing to strike her for cause.

3. The trial court did not err in denying Brady's motion to change venue. A motion for change of venue based upon pretrial publicity is in the trial court's discretion and its ruling will not be disturbed absent abuse of that discretion. *Dixson v. State*, 269 Ga. 898 (2) (506 SE2d 128) (1998). Brady's burden is to show (1) that the trial's setting was inherently prejudicial or (2) that the jury selection process revealed actual prejudice to a degree that rendered a fair trial impossible. Id.

First, "[t]he general rule is that appellate courts will not reverse the trial court's overruling of a motion for change of venue where the appellant has not exhausted his peremptory challenges," as was the case here. *Coleman v. State*, 237 Ga. 84, 92 (1) (226 SE2d 911) (1976).

Second, there is no merit to Brady's contention that the jury selection process revealed actual prejudice. Eighty-two jurors were sworn, sixty-three were questioned, four were deferred for personal reasons, and ten were excused for cause. Of those ten, one was excused for religious reasons, one because she was a law enforcement officer, six because of some connection to the victims or their family, and two for prior knowledge of and exposure to the case; one of those two had been exposed to the case through mass communications media, and the other had learned of the case from a law enforcement friend. The court correctly ruled that this failed to reveal an inability to obtain a fair and impartial jury. *Dixson*, supra at 899.

4. Brady contends his trial counsel was ineffective in several respects. In order to prevail on this claim, he must show both that counsel's performance was deficient and that the deficient performance was prejudicial to his defense. *Smith v. Francis*, 253 Ga. 782, 783 (325 SE2d 362) (1985), citing *Strickland v. Washington*, 466 U. S. 668 (104 SC 2052, 80 LE2d 674) (1984). To meet the first prong of this test, Brady must overcome the "strong presumption" that counsel's performance fell within a "wide range of reasonable professional conduct" and that counsel's decisions were "made in the exercise of reasonable professional judgment." Id. The reasonableness of counsel's conduct is examined from counsel's perspective at the time of trial and under the circumstances of the case. Id. at 784. The second prong requires that Brady show there is a reasonable probability that, absent counsel's unprofessional errors, the result of the trial would have been different. Id. at 783.

(a) Brady contends that his trial counsel, Sliz, recognized that one attorney would not be able to properly represent him and instead of securing additional counsel to represent Brady chose to meet the situation by abdicating his responsibilities to Jackson, who was counsel for co-defendant Avery. However, the record does not reveal that Sliz believed he could not fulfill his duty and does not show he abdicated his role to Jackson. Rather, counsel for both defendants determined that their defenses were not adversarial, but were in fact the same; the evidence against them was only circumstantial, they were not present, and the murders were committed by other persons. Counsel chose to pool their resources, and Sliz concentrated on attacking the State's case, while Jackson, Avery's counsel, focused on showing that others could have committed the crimes.

As this Court has observed, a defense attorney may face finite resources of time and money such that a reasonably competent attorney often must rely on his own experience and judgment, without the benefit of a substantial investigation, when deciding whether or not to forego a particular line of defense. *Jefferson v. Zant*, 263 Ga. 316, 320 (3) (b) (431 SE2d 110) (1993). The question is whether the deci-

sion was reasonable under the circumstances. Id. Although Brady argues the decision to divide responsibility with Jackson was unreasonable as it was undertaken without Sliz making any independent decision or review of the evidence supporting the theory that others committed the crime, the record reveals that Sliz discussed pursuit of this theory with Jackson and spoke with him several times about witnesses and evidence that had been found. Sliz also spoke with the investigator Jackson employed, whom Sliz had employed in the past and whom Sliz knew to be very competent and thorough, and Sliz believed he could rely on the investigator in this instance. Accordingly, the trial court did not err in finding Sliz' actions reasonable.

Brady also complains that in pursuing this strategy, the defense tried to show that other persons committed the murders for reasons connected with the Reids' purported involvement with drugs, a strategy which inflamed the jury because the Reids were well known and respected in the community. However, the possibility that the victims were involved in the drug trade was actually introduced by the State in attempting to show a motive for Brady's commission of the crimes. Defense efforts to show other persons killed the Reids because of drug activity included a witness, Thompson, who testified that Daniel, a drug dealer, had told her that he killed the Reids, shooting one in the leg and one in the head, because Tony Reid owed him $16,000 for drugs. On cross-examination, the witness stated she had previously told police that Daniel said he had shot one of the Reids in the kneecap and one in the back. She also stated that she had a conversation about the Reid murders with Kahn, but Kahn testified that Thompson had not told her about Daniel's statement. Kahn did testify that a man came into the club where she worked and stated that he knew who killed the Reids and where the murder weapon was located. Another witness, Marler, testified that drug sales were conducted through an automobile auction business that Tony Reid owned, that Daniel had told him Reid was endangering Daniel's drug enterprise by spending more money than he should, and that Daniel had stated he had paid ten thousand dollars to "take care of" the Reids.

Brady contends Thompson's cross-examination and Kahn's testimony showed this defense was unreasonable because Thompson's testimony was not supported by Kahn and did not comport with the physical evidence, in that Tony Reid was shot in the head and Kathy Reid was shot in the head and back of the thigh, not the knee. Defense counsel must deal with the witnesses available and their testimony, imperfect though it may be. The testimony of these witnesses certainly formed a reasonable basis for a defense, and in these circumstances, it cannot be said that the defense chosen was so poorly considered or so unsupported as to be ineffective.

(b) A witness testified that she saw an automobile of a type belonging to Brady leaving the victims' home on the morning of December 18, 1989. Brady contends counsel was ineffective in not filing a motion to suppress this evidence on the ground her identification was tainted because investigators mailed to her two photographs of Brady's vehicle and inquired whether it was similar to the one she saw. However, he fails to show that such a motion would have benefitted his defense as there is no reasonable probability that any motion to suppress would have been granted. In considering such a motion, the trial court would be called upon to consider several factors, including the level of certainty in the identification demonstrated by the witness. See *Lowe v. State*, 264 Ga. 757, 758 (2) (452 SE2d 90) (1994). In rejecting Brady's motion for new trial, the court noted that the witness had only identified the automobile in the photographs as similar to the one she saw leave the victims' home.

(c) The State presented testimony that a set of keys that had been in Brady's possession included a key that fit several lock boxes at Tony Reid's place of business. Brady rebutted this evidence with the testimony of a locksmith who stated that the lock boxes were of a type that was in wide circulation, that the manufacturer of the locking mechanisms in question produced a relatively small number of different versions of the mechanisms, and that the probability of any one key by that manufacturer fitting any one lock by the manufacturer was approximately one in ten. On cross-examination, the witness testified that he had not tested the locks against the key in question because he had not been asked to do so. Brady contends it was ineffective assistance of counsel for Sliz not to have the witness perform such a test, but he does not argue why any reasonable strategy would require that the witness do so, or how the witness' performing such a test would have benefitted Brady at trial.

(d) Sliz did not file a motion for new trial, and Brady contends Sliz did not cooperate with appellate counsel. However, Brady does not suggest how a motion for new trial would be more advantageous to him than a direct appeal, or how Sliz has impeded appellate counsel from pursing any appellate issue.

5. Brady contends a variety of evidence was admitted that improperly commented on his character without Brady first putting his character in issue. See OCGA § 24-9-20 (b).

(a) Evidence of illegal drug use on Brady's part was admitted, but as the State noted at the hearing on Brady's motion in limine, drug use showed Brady's motive to rob a home where he believed illegal drugs and money would be found. Although motive is not an essential element in proving the crimes charged, the State is entitled to present evidence to establish that there was a motive, and evidence that Brady used drugs is relevant to prove that he had a

motive for committing the crimes and is not rendered inadmissible by the fact that it incidentally puts his character in issue. *Johnson v. State*, 260 Ga. 457, 458 (2) (396 SE2d 888) (1990).

(b) In establishing the commission of a prior similar criminal transaction, the State introduced a certified copy of the convictions and a certified copy of the record of the Department of Corrections showing Brady's release on parole on October 5, 1989, shortly before the Reids were killed. Although Brady contends his parole status should not have been revealed, he specifically acquiesced in the introduction of that information and cannot now complain. *Holcomb v. State*, 268 Ga. 100, 103 (2) (485 SE2d 192) (1997).

(c) Review of the record does not indicate that the State elicited testimony from Hammett that he met with Brady while Brady was in jail.

(d) Evidence that Brady and Avery told their girlfriends that they had killed two unidentified people was introduced as evidence of the crimes charged, not as evidence that they had killed two people other than the Reids, and the jury was properly charged that the evidence was to be considered only for its relevance to the crimes charged.

6. Evidence of the prior criminal transaction discussed in Division 5 (b), supra, was presented, but Brady contends it was not sufficiently similar to the crimes charged for proper admission. See *McGee v. State*, 267 Ga. 560, 562-564 (2) (480 SE2d 577) (1997); *Williams v. State*, 261 Ga. 640, 642 (2) (b) (409 SE2d 649) (1991).

The prior crimes were burglary and armed robbery which occurred in a house. In 1983, Brady telephoned an accomplice, Davis, and asked if he was ready to go. Davis went to Brady's house and the two men went to a convenience store. There they met two other men, although Davis had thought only one other man would be involved. The other two men assured Brady and Davis that the house they were planning to enter was unoccupied. Brady and Davis intended to steal $15,000 and a quarter of a pound of cocaine that they believed to be on the premises. They entered the house by cutting the back screen door. Encountering occupants, they taped the occupants' hands with duct tape and forced them to lie on the floor of a closet. They then searched the house for valuables. Although Brady was not armed, Davis was. In leaving, Brady and Davis stole a vehicle.

Brady contends that the 1983 incident is not sufficiently similar because there was no forced entry into the Reids' home, the 1983 crimes were "a spur of the moment" decision, and no vehicle was taken from the Reids' house. However, evidence showed that in each case, Brady believed drugs and a substantial sum of money could be found in the home. When the Reids were killed, they were lying on the floor. As to Davis' statement that the 1983 episode was under-

taken "on the spur of the moment," he clearly testified that the criminal enterprise was planned more than a day in advance; evidence also showed the Reid home was likewise targeted in advance. The trial court was authorized to find that the two transactions were sufficiently similar so that the 1983 crimes were relevant to show Brady's bent of mind in burglarizing homes where he believed drugs and a large amount of currency could be found. See *Mainer v. State*, 267 Ga. 448, 449 (479 SE2d 731) (1997).

7. The trial court allowed an audio tape recording of Brady's conversation with Hammett to be played for the jury. Brady contends it should not have been played because portions of it were inaudible. Whether to admit into evidence a tape recording of a conversation when part of the conversation is inaudible is in the trial court's discretion. *Guess v. State*, 264 Ga. 335, 336 (2) (443 SE2d 477) (1994). The court did not abuse its discretion in this instance, and this Court has already determined that playing the tape recording at issue was not error. *Avery*, supra at 586 (5).

*Judgments affirmed. All the Justices concur.*

DECIDED MARCH 1, 1999.

*John B. Sumner*, for appellant.

*Garry T. Moss, District Attorney, Thurbert E. Baker, Attorney General, Mary Beth Westmoreland, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General,* for appellee.