## S02A0626. MILLER v. THE STATE.
### (571 SE2d 788)

SEARS, Presiding Justice.

Appellant Jonathan Miller appeals his convictions for felony murder, aggravated assault and aggravated battery, and his resulting life sentence.[1] Having reviewed the record and the transcript of trial, we conclude that the superior court properly exercised jurisdiction over this case, that the evidence was sufficient to support the jury's verdicts, that the trial court did not abuse its discretion in ruling on the eligibility of prospective jurors, and that there was no

---

[1] The crimes occurred on November 2, 1998. Appellant was indicted on December 14, 1998, and tried on April 26-May 7, 1999. Appellant was found guilty of felony murder (with aggravated assault and aggravated battery as the underlying felonies), aggravated assault, and aggravated battery. He was sentenced to life imprisonment for felony murder, and the aggravated assault and aggravated battery convictions were merged by operation of law. A new trial motion was filed on June 4, 1999, which was denied on October 4, 2000. The trial transcript was certified by the court reporter on December 17, 2001. Appellant filed a timely notice of appeal on October 11, 2000, the appeal was docketed with this Court on January 10, 2002, and was argued orally on May 2, 2002.

prosecutorial misconduct during closing arguments. Having found no error associated with appellant's trial and conviction, we affirm.

The evidence authorized the jury to conclude that in November 1998, appellant Jonathan Miller, then 15 years old, rode home on the school bus while seated behind 13-year-old Joshua Belluardo. Appellant had previously taunted and bullied Joshua. On this particular day, appellant sat behind Joshua and threw items at him. Joshua told appellant to stop, and appellant responded by taunting Joshua, calling him names such as "bitch" and "faggot," and challenging Joshua to a fight. When the bus stopped, appellant asked rhetorically whether he should hit Joshua on the back of the head or in the face. Joshua then quickly exited the school bus and appellant followed. Approaching Joshua from behind, appellant hit him with his fist on the back of the head. Joshua collapsed to the ground. Appellant again struck Joshua and kicked him once, then fled the scene.

After being struck, Joshua moaned and had extreme difficulty breathing. A bystander attempted to roll him over, and he stopped breathing altogether. When medical personnel arrived and administered CPR, Joshua resumed breathing and regained a regular pulse. He was taken to the hospital, but he never regained consciousness. Doctors later determined that when appellant struck Joshua on the back of his head, he created a tear in Joshua's vertebral artery, causing blood to flood into Joshua's brain and spinal column. A neurosurgeon later opined that when Joshua arrived at the hospital, his brain had ceased normal functioning. Two days later, Joshua was removed from life support and pronounced dead.

Appellant was originally charged in the juvenile court with aggravated assault and aggravated battery. After Joshua died, appellant was charged with felony murder based upon those same two crimes. The juvenile complaint was then dismissed, and the superior court took jurisdiction of the case for bond purposes. Five weeks later, appellant was indicted in superior court for felony murder, aggravated assault and aggravated battery. Appellant was tried in the superior court, convicted of all three crimes, and sentenced to life in prison.

1. The evidence introduced at trial, viewed in a light most favorable to the jury's verdict, was sufficient to enable rational triers of fact to find appellant guilty beyond a reasonable doubt of felony murder, aggravated assault, and aggravated battery.[2]

Contrary to appellant's argument, causing brain loss does fit the statutory definition of aggravated battery, which is defined as "maliciously caus[ing] bodily harm to another by depriving him or her of a

---

[2] *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

member of his or her body, [or] by rendering a member of his or her body useless."[3] The indictment in this case alleged that appellant committed aggravated battery by rendering Joshua's brain useless and by depriving Joshua of his brain. When the evidence shows that a battered victim has suffered a severe injury to their brain, resulting in the loss of normal brain functioning, they are said to have been "deprived of their brain," thus suffering an aggravated battery.[4]

While appellant is correct that one who "dies instantaneously from the first blow cannot be subject to an aggravated battery,"[5] there was evidence at trial from which the jury could have concluded that Joshua did not die instantaneously. The examining pathologist testified that on average, high-volume blood flow into the brain and spinal column, such as was suffered by Joshua, does not cause a cessation in brain functioning for at least 60 seconds. Moreover, witnesses testified that Joshua moaned and gasped for air after being struck, and the attending emergency medical technician testified that after Joshua was resuscitated, he maintained a pulse while being transported to the hospital. Accordingly, the evidence authorized the jury to conclude that Joshua's death was not instantaneous.

The evidence also authorized the jury to find appellant guilty of aggravated assault. A person commits aggravated assault when (among other things) he (1) attempts to commit a violent injury or places another in reasonable apprehension thereof, and (2) assaults another with "a deadly weapon or any object, device, or instrument which, when used offensively against a person, is likely to or actually does result in serious bodily injury."[6] Witnesses testified that appellant threatened Joshua with physical harm, approached Joshua from behind and inflicted a fierce blow to the back of his head, causing Joshua to collapse to the ground. Appellant then again struck Joshua and kicked him once. Hence, there was evidence from which the jury could conclude that appellant attempted to inflict a violent injury on Joshua, thus establishing the first of these elements.

As for the other element of aggravated assault, the indictment charged that appellant attacked Joshua with a deadly weapon — i.e., his hands and feet. Although hands and feet are not considered to be deadly weapons per se, the jury may find them to be so depending upon their use, the injuries inflicted, and other surrounding circum-

---

[3] OCGA § 16-5-24 (a).

[4] See *Scott v. State*, 243 Ga. App. 383, 384-385 (532 SE2d 141) (2000); *Griffin v. State*, 170 Ga. App. 287, 293 (316 SE2d 797) (1984).

[5] *Patrick v. State*, 247 Ga. 168, 170 (274 SE2d 570) (1981); see *Hance v. State*, 245 Ga. 856, 861 (268 SE2d 339) (1980) (in order to constitute aggravated battery, the bodily harm to the victim must occur before death). We note that the jury was instructed that if it concluded Joshua's death was instantaneous, there could be no aggravated battery.

[6] OCGA § 16-5-21 (a) (2); *Smith v. Hardrick*, 266 Ga. 54, 55 (464 SE2d 198) (1995).

stances.[7] Evidence at trial showed that Joshua was hit so hard from behind that his arms flew up in the air as he fell. While there was evidence to indicate that a vertebral artery hemorrhage, such as was suffered by Joshua, can be linked to subtle factors such as head placement and movement, the examining pathologist testified that Joshua's fatal injury was caused by external blunt-force trauma that was, at a minimum, equivalent to a grown man's use of moderate force. In light of this evidence, we conclude the jury was authorized to find appellant guilty of aggravated assault.

2. Pursuant to OCGA § 15-11-28 (b) (2) (A), the superior court is vested with exclusive jurisdiction over the trial of young people aged 13 to 17 who are alleged to have committed, among other crimes, murder. Appellant, who was 15 at the time of Joshua's death, argues that because he was accused of felony murder, rather than "murder," his trial did not fall within this jurisdictional mandate, and hence he should not have been tried in the superior court. This argument is unavailing. "Murder is [an] offense which can be committed . . . either with malice aforethought or while in the commission of a felony."[8] Throughout our Criminal Code, the offenses of felony murder and malice murder are frequently treated together as "murder."[9] In these statutes, the term "murder" is consistently construed as applying to both felony and malice murder. As in these other statutes, we believe the legislature's reference to "murder" in the jurisdictional mandate of OCGA § 15-11-28 (b) (2) (A) is obviously intended to encompass both felony and malice murder.

3. Six days before voir dire commenced, twelve students and one teacher were killed by two fellow students at Columbine High School in Littleton, Colorado, generating a substantial amount of national and local media coverage. Immediately before voir dire, appellant moved for a continuance, arguing that because of the media's portrayal of the Columbine incident, especially with regard to violence among young people and in schools, there was a reasonable likelihood that appellant would not receive a fair trial.[10] A hearing was

---

[7] *Smith v. Hardrick*, 266 Ga. at 55; *Dixon v. State*, 268 Ga. 81, 82 (485 SE2d 480) (1997); *Wheeler v. State*, 232 Ga. App. 749, 750 (503 SE2d 628) (1998). Contrary to appellant's argument, our decision in *Smith v. Hardrick*, supra, does not require the State to show that appellant knew his hands and feet, as used, were likely to result in the injuries sustained by Joshua.

[8] *State v. Jones*, 274 Ga. 287, 288 (553 SE2d 612) (2001).

[9] See OCGA § 17-3-1 (a) (a "murder" prosecution has no statute of limitation); OCGA § 16-5-1 (Code section defining malice and felony murder provides that one convicted of "murder" may be punished by life imprisonment or death); OCGA § 17-10-9.1 (a judge may not release one convicted of "murder" prior to his surrender to jail officials); OCGA § 17-6-1 (a) ("murder" is bailable only before a superior court judge).

[10] See *United States v. Nix*, 465 F2d 90, 95 (5th Cir. 1972), citing *Sheppard v. Maxwell*, 384 U. S. 333 (86 SC 1507, 16 LE2d 600) (1966).

held on the motion, after which the trial court denied the requested continuance. On appeal, appellant claims that denial was erroneous.[11]

The denial of a motion to continue will only be reversed when there has been a clear abuse of discretion by the trial court.[12] In support of his motion, appellant presented the expert testimony of a jury selection consultant who testified that in his opinion, even though the Columbine incident and the death of Joshua Belluardo were unrelated, the media's coverage of the two incidents had linked them together so as to create an emotional atmosphere that would prevent appellant from receiving a fair trial. When pressed on this opinion, however, the expert conceded that whether a fair trial would be possible depended upon how individual jurors obtained and processed their information concerning the Columbine killings. Moreover, when questioned about the basis for his opinion, the expert conceded that while there was significant coverage of the Columbine High School killings in the local media, he was aware of only one local newspaper article that linked the Columbine incident with appellant's trial, and that particular article simply addressed the fact that defense counsel had moved for a continuance by alleging that a fair trial could not be obtained due to the events at Columbine.[13] Furthermore, the expert admitted that he had performed no assessment of community attitudes in the wake of the Columbine killings to determine if there was any indication of a pervasive and emotionally-charged environment that would interfere with appellant's fair trial rights.

In light of these factors, and having reviewed the transcripted hearing on appellant's motion, we conclude his argument that media coverage of the Columbine incident would prevent him from obtaining a fair trial was based primarily upon speculation, and that he failed to make a showing of the necessity for a continuance. Accordingly, we find no abuse of discretion in the trial court's denial of the motion for a continuance.

4. Appellant also enumerates as error the trial court's denial of his pretrial motion requesting a change in venue due to an inherently prejudicial atmosphere created by adverse pretrial publicity and also due to actual bias on the part of prospective jurors. The trial court properly reserved ruling on appellant's motion until after the

---

[11] The evidence of record does not support appellant's claim that the district attorney rather than the trial court independently calendared and called appellant's case for trial. See *Cuzzort v. State*, 271 Ga. 464, 465 (519 SE2d 687) (1999).

[12] *Young v. State*, 237 Ga. 852, 855 (230 SE2d 287) (1976). See OCGA § 17-8-22.

[13] See Atlanta Journal-Constitution, April 25, 1999, F-1 ("Citing Littleton, Lawyers Seek Delay in Teen's Case").

completion of voir dire, because when determining whether a change of venue is necessary, a critical factor is the effect of pretrial publicity on prospective jurors' ability to maintain their objectivity.[14]

The transcript of voir dire shows that the majority of potential jurors had been exposed to at least some pretrial publicity concerning Joshua's death. Given the nature of the crimes charged and the ages of the parties involved, it is not surprising that there was widespread media coverage of Joshua's death and appellant's subsequent trial. Standing alone, however, this factor does not militate in favor of a change of venue, as pretrial exposure to information about a criminal matter is not the same thing as pretrial exposure to inflammatory or prejudicial material that threatens an accused's right to a fair trial.[15] Appellant takes issue with several prospective jurors who reported they had heard that appellant "beat" Joshua to death. However, even if we accept appellant's argument that these several jurors were misinformed,[16] "being informed or even misinformed is not always the same thing as being inflamed or prejudiced."[17] Even in cases of widespread pretrial publicity, situations where such publicity has rendered a trial setting inherently prejudicial are extremely rare.[18] We have reviewed the evidence of record concerning the actual pretrial publicity in this matter, and it was not inherently prejudicial, unduly extensive, prejudicially inflammatory, or reflective of a hostile atmosphere so as to require a change of venue.[19] If anything, we are inclined to agree with those prospective jurors who reported during voir dire that the pretrial publicity they had seen tended to make them feel empathy for both appellant and Joshua.

Concerning appellant's claim that a change in venue was mandated due to actual bias on the part of prospective jurors, the record shows that the trial court excused 18 prospective jurors for cause. Of those eighteen jurors, seven were excused for cause because they had formed strong opinions as to appellant's guilt or innocence due to pretrial publicity,[20] and three were excused for cause due to a combination of factors that included opinions based upon pretrial publicity.[21]

---

[14] *Gissendaner v. State*, 272 Ga. 704, 706 (532 SE2d 677) (2000).

[15] *Lemley v. State*, 258 Ga. 554, 556 (372 SE2d 421) (1988).

[16] We do not, however, accept appellant's contention that this is a gross distortion of the facts put into evidence by the State.

[17] *Lemley*, 258 Ga. at 556. While we note that one potential juror went so far as to say she had heard that Joshua had been beaten to death with a stick or baseball bat, that juror later clarified that she had heard this misinformation not through pretrial publicity, but rather "in idle conversation . . . [she] more or less overheard."

[18] *Lemley*, 258 Ga. at 556; *Ross v. State*, 268 Ga. 122, 123 (485 SE2d 780) (1997), overruled on other grounds, *Bishop v. State*, 271 Ga. 291 (519 SE2d 206) (1999).

[19] See *Cromartie v. State*, 270 Ga. 780, 782 (514 SE2d 205) (1999).

[20] These were Jurors Italio, Free, Boone, Denton, Emanuel, Jones, and Potter.

[21] These were Jurors Lisle, Carmichle, and Minick.

The other eight jurors excused for cause were excused for reasons other than opinions drawn from their exposure to pretrial publicity.[22] Accordingly, of the sixty-six prospective jurors who participated in voir dire, ten jurors (approximately 15.2%) were excused in whole or in part due to their exposure to pretrial publicity. We conclude that in a widely publicized case such as this one, this number of excusals, particularly in light of the detailed attention given by the trial court to voir dire and the "exacting standards applied . . . in excusing certain jurors,"[23] does not indicate the existence of an inherently prejudicial or biased atmosphere that would mandate a change in venue.[24] Accordingly, the trial court did not abuse its discretion in denying appellant's request that venue be changed.

5. Appellant argues the trial court erred by denying his motions to strike eight jurors for cause. The decision whether to strike a prospective juror for cause lies within the trial court's discretion and will not be disturbed unless it is shown that the juror's opinion "is so fixed and definite that [he or she] will be unable to set the opinion aside and decide the case based upon the evidence" and the trial court's instructions.[25] Neither a prospective juror's doubts as to his ability to be impartial nor his statement that he will "try" to set aside any preconceived notions mandate as a matter of law that the juror be excused for cause.[26] Based upon these principles, for the reasons explained below, we conclude that the trial court did not abuse its discretion in refusing to strike the following jurors.

Appellant urges that Prospective Juror Arnell should have been excused because he had formed an opinion as to appellant's culpability based upon his extensive exposure to media accounts concerning Joshua's death. The transcript shows, however, that Arnell stated he would strive to remain open-minded, would carefully listen to the evidence, and understood the presumption of innocence. He also stated that when deciding the case, he would do his "utmost best" to set aside all of the pretrial publicity he had seen and heard, as well as any fixed opinions he may have formed, and decide the matter based solely on the evidence.

Prospective Juror Irons testified that he had been exposed to publicity about the case and was of the opinion that appellant was

---

[22] These were Jurors Brown, Adan, Barnes, Rawls, Haney, Zaski, Pogue, and Bagwell.

[23] *Gissendaner v. State*, 272 Ga. at 707.

[24] See *Gissendaner v. State*, 272 Ga. at 707 (no evidence of inherently prejudicial environment where 14 of 111 jurors (12.6%) were excused for cause due to exposure to pretrial publicity); *Roundtree v. State*, 270 Ga. 504, 505 (511 SE2d 190) (1999).

[25] *Kirkland v. State*, 271 Ga. 217, 219 (518 SE2d 687) (1999); *Garland v. State*, 263 Ga. 495, 496 (435 SE2d 431) (1993).

[26] *Corza v. State*, 273 Ga. 164, 167 (539 SE2d 149) (2000); *Brady v. State*, 270 Ga. 574, 575 (513 SE2d 199) (1999).

"probably guilty of what he was charged with," but that he would have no difficulty setting aside what he had heard about the case and any resulting conclusions. Irons clearly stated that he would follow the trial court's instruction, and render a verdict based solely on the evidence "to the best of [his] ability."

Prospective Juror Jones testified that media reports had led him to believe that appellant had beaten the victim to death, and that he was more inclined to side with the prosecution. Jones also stated, however, that he could set aside his pretrial biases and base his verdict solely on the evidence. He also affirmed that he understood the presumption of innocence, as well as the need to establish guilt beyond a reasonable doubt.

Prospective Juror Austin stated that due to media reports, she was inclined to believe appellant was responsible for Joshua's death. She also stated, though, that she knew very few actual facts of the case, did not always trust what she heard in the media, and, because she had not heard all of the facts, had formed no opinions as to appellant's guilt or innocence. Finally, she unequivocally said that she could put aside what little information she had heard when deciding this matter.

Prospective Juror Shedd testified she had read and heard about the case, "felt sorry because it happened . . . and a child is dead," and believed appellant had "beat up [the victim]." She declined, however, to state that she believed appellant had killed the victim. She also stated that she did not have a fixed opinion about appellant's guilt or innocence, and that she "supposed" she could set aside any leanings or inclinations she might have and decide the case solely on the evidence and the court's instruction.

Prospective Juror D. Jones stated that even though he had not read anything in the newspaper about the case and had only briefly seen a television report, he was of the opinion that appellant was a bully and "did the killing." Jones also stated clearly, though, that he could set aside his preconceived opinions and judge the case based solely on the evidence.

Prospective Juror Hedden testified that she had overheard "in idle conversation" that appellant had hit the victim with a stick or a baseball bat, but had not formed an opinion about the case and could "definitely" base her decision solely on the evidence and the trial court's instructions.

Prospective Juror McNabb testified that if everything she had heard before trial was accurate, she tended to believe appellant had committed the crimes charged. McNabb, however, could not recall any specific media reports of the case, stated she would do "her best" to be an impartial juror, and firmly stated that her decision would be based solely on the evidence and the trial court's instructions.

The transcript of voir dire clearly establishes that none of these prospective jurors held an opinion regarding appellant's guilt or innocence that was "so fixed and definite that [they would] be unable to set the opinion aside and decide the case based upon the evidence" and the trial court's instructions.[27] Accordingly, based upon the principles discussed above, the trial court did not abuse its discretion in denying appellant's motions to strike these jurors for cause.

6. Appellant contends the trial court's charge to the jury that it could convict him of felony murder based upon aggravated assault or based upon aggravated battery may have led to a less than unanimous verdict, as some jurors may have voted to convict based upon one underlying felony while other jurors may have voted to convict relying upon the other underlying felony.[28] The verdict form, however, shows that appellant was found guilty of both aggravated battery and aggravated assault; hence, there are two independent underlying felony convictions that sustain the felony murder conviction. Accordingly, appellant's felony murder conviction is not deficient for being predicated upon multiple felonies without specification.[29]

7. Appellant claims a mistrial should have been declared due to several of the prosecutor's statements made during closing arguments. Over appellant's objection, the prosecutor stated the following during closing arguments:

The defense stipulates that [appellant] intentionally struck

---

[27] *Kirkland v. State*, 271 Ga. at 219; *Garland v. State*, 263 Ga. at 496.

[28] Appellant was indicted for felony murder based upon aggravated assault *and* aggravated battery. The fact that the trial court charged the jury it could convict appellant of felony murder based upon aggravated assault *or* aggravated battery does not evidence an unconstitutional disparity between the allegations and the evidence adduced. See *DePalma v. State*, 225 Ga. 465, 469 (169 SE2d 801) (1969).

[29] Compare *Thompson v. State*, 271 Ga. 105, 108-109 (519 SE2d 434) (1999) (appellant was charged with a single count of felony murder based on three underlying felonies and the jury returned a general verdict of guilty on felony murder; this Court reversed the conviction for one underlying felony and was unable to determine which of the alternative underlying felonies might have served as a basis for the felony murder conviction, requiring reversal). We decline appellant's request that we discard Georgia's "antiquated" felony murder rule because it allows conviction without a showing of an intention to kill. The express language of Georgia's felony murder statute, OCGA § 16-5-1 (c), allows conviction regardless of malice or intent to commit murder, so long as it is shown the defendant intended to commit the underlying felony. *Holliman v. State*, 257 Ga. 209, 210 (356 SE2d 886) (1987). Moreover, to the extent that appellant claims Georgia's "antiquated" felony murder rule renders his conviction unconstitutional, he failed to timely raise the constitutional issue at trial. *Rowe v. State*, 266 Ga. 136, 137 (464 SE2d 811) (1996); *Williams v. State*, 199 Ga. 504, 507 (34 SE2d 854) (1945). Furthermore, the trial court did not rule specifically on this constitutional challenge, *Wilson v. State*, 212 Ga. 157, 158 (91 SE2d 16) (1955), and appellant failed to articulate the grounds for his challenge before both the trial court and this Court. *Wallin v. State*, 248 Ga. 29, 30 (279 SE2d 687) (1981). Hence, this issue is deemed waived on appeal.

> Joshua in the back of the head . . . and that Joshua died as a result of a vertebral artery hemorrhage. Members of the jury, have you heard of a defense attorney asking you to convict their client of a crime?

Insofar as appellant did stipulate to hitting Joshua and to the cause of Joshua's death, this argument, stated as a rhetorical question, was permissible as reasonable inferences drawn from the evidence.[30]

The prosecutor also argued to the jury that: "[The defense wants you to think] that fifteen-year-olds couldn't mean to hurt each other. . . . [But] we know that every day children do horrible things to other children." Appellant contends this was an inflammatory and prejudicial reference to the shootings at Columbine High School, and thus an attempt to inject improper considerations into deliberations. We disagree. The prosecutor's statement referred to something that happens "every day," and (fortunately) incidents such as what occurred at Columbine High School are extremely rare. Furthermore, having reviewed the transcription of arguments, we believe that with this statement, the prosecutor was responding to appellant's argument that children should not be held to the same standard of responsibility for their actions as adults.

In opening statements, appellant told the jury that evidence would show he had not thrown anything at Joshua on the school bus on the day of the killing. No such evidence was brought forth during trial. In closing arguments, the prosecutor said that the defense "had access to every child on that [school] bus and every person in the neighborhood, and if they had been able to present you a witness that supported their theory of the case, they would have." On appellant's objection, the trial court instructed the prosecutor to cease this line of argument. We do not believe this single statement improperly shifted the burden of proof by suggesting appellant had a duty to present witnesses. Nor did the statement improperly comment upon appellant's Fifth Amendment right not to testify. The statement was permissible, as the prosecution may, in closing arguments, urge the jury to draw reasonable deductions from a defendant's failure to produce purportedly favorable witnesses.[31]

Appellant takes issue with several other portions of the prosecutor's closing argument. At trial, however, appellant either failed to object to these comments, failed to object on the grounds raised on appeal, or failed to request curative instructions and the declaration of a mistrial after his objection was sustained and the prosecutor was told to cease a particular line of argument. It follows that these

---

[30] *Simmons v. State*, 266 Ga. 223, 228 (466 SE2d 205) (1996).
[31] *Sinkfield v. State*, 266 Ga. 726, 728 (470 SE2d 649) (1996).

remaining enumerations are waived on appeal.[32]
*Judgment affirmed. All the Justices concur.*

BENHAM, Justice, concurring.
While I concur in the majority opinion, I cannot help but believe that as we treat more and more children as adults and impose harsher and harsher punishment, the day will soon come when we look back on these cases as representing a regrettable era in our criminal justice system. As we were developing our juvenile justice system, we sought to treat children differently from adults because we recognized they had not developed the problem-solving skills of adults. We now lump certain children in the same category as adults and mete out harsh punishment to them, ignoring the differences between childhood and adulthood.

DECIDED OCTOBER 28, 2002 —
RECONSIDERATION DENIED NOVEMBER 22, 2002.

*Bruce S. Harvey, Larry D. Wolfe, Michael B. Syrop,* for appellant.
*Garry T. Moss, District Attorney, Rosemary Kittrell, Assistant District Attorney, Thurbert E. Baker, Attorney General, Wylencia H. Monroe, Assistant Attorney General,* for appellee.

---

[32] *Todd v. State,* 261 Ga. 766, 767 (410 SE2d 725) (1991); *Perry v. State,* 274 Ga. 236, 239 (552 SE2d 798) (2001); *Woodham v. State,* 263 Ga. 580, 582 (439 SE2d 471) (1993).